**THE FREE SPEECH COALITION, on its own behalf and on behalf of its members; Bold Type, Inc.; Jim Gingerich; Ron Raffaelli, Plaintiffs–Appellants,**

v.

**Janet RENO, Attorney General, United States Department of Justice, Defendants–Appellees.**

No. 97–16536.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1998

Filed Dec. 17, 1999

H. Louis Sirkin, Sirkin, Pinales, Mizibov & Schwartz, Cincinnati, Ohio, for the plaintiffs-appellants.

Jacob M. Lewis, United States Department of Justice, Washington, D.C. for the defendants-appellees.

Michael A. Bamberger, Sonnenschein Nath & Rosenthal, New York, NY, for Amicus Curiae.

Before: Warren J. Ferguson and Sidney R. Thomas, Circuit Judges, and Donald W. Molloy,[1] District Judge.

Opinion by Judge MOLLOY; Dissent by Judge FERGUSON.

MOLLOY, District Judge:

### I.

The question presented in this case is whether Congress may constitutionally proscribe as child pornography computer images that do not involve the use of real children in their production or dissemination. We hold that the First Amendment prohibits Congress from enacting a statute that makes criminal the generation of images of fictitious children engaged in imaginary but explicit sexual conduct.

### II.

In this case, the district court found that the Child Pornography Prevention Act of 1996 ("CPPA" or the "Act") was content-neutral, was not unconstitutionally vague or overbroad, and did not constitute an improper prior restraint of speech. The district court also found that the Child Pornography Prevention Act's affirmative defense did not impermissibly shift the burden of proof to a defendant by virtue of an unconstitutional presumption.

While we agree that the plaintiffs have standing to bring this case and that the Act is not an improper prior restraint of speech, the balance of the district court's analysis does not comport with what we believe is required by the Constitution. We find that the phrases "appears to be" a minor, and "convey[s] the impression" that the depiction portrays a minor, are vague and overbroad and thus do not meet the requirements of the First Amendment. Consequently we hold that while these two provisions of the Act do not pass constitutional muster, the balance of the Child Pornography Prevention Act is constitutional when the two phrases are stricken. Whether the statutory affirmative defense is constitutional is a question that we leave for resolution in a different case.

### A.

The appellants consist of a group that refers to itself as "The Free Speech Coalition." The Free Speech Coalition is a trade association of businesses involved in the production and distribution of "adult-oriented materials." Bold Type, Inc. is a publisher of a book "dedicated to the education and expression of the ideals and philosophy associated with nudism;" Jim Gingerich is a New York artist whose paintings include large-scale nudes; and Ron Raffaelli is a professional photographer whose works include nude and erotic photographs.

The Free Speech Coalition sought declaratory and injunctive relief by a pre-enforcement challenge to certain provisions of the Child Pornography Prevention Act of 1996. The complaint was filed in the Northern District of California. Both parties moved for summary judgment. The district court determined the CPPA was constitutional and granted the government's motion for summary judgment. *See The Free Speech Coalition v. Reno,* No. C 97–0281 VSC, 1997 WL 487758, at *7 (N.D.Cal. Aug.12, 1997).[2] At the same time it denied Free Speech's cross motion for summary judgment. *See id.* After the

---

1. The Honorable Donald W. Molloy, United States District Judge for the District of Montana, sitting by designation.

2. The Opinion of the district court is not published in the Federal Supplement.

district court's adverse ruling, Free Speech appealed.

In this appeal, Free Speech argues the district court was mistaken in its determination that the legislation is content neutral. They also argue that the district court was wrong to hold that the Act is not unconstitutionally vague. The argument is that where the statute fails to define "appears to be" and "conveys the impression," it is so vague a person of ordinary intelligence cannot understand what is prohibited. Free Speech also questions the district court's holding that the affirmative defense provided in the Act is constitutional. Finally, Free Speech appeals the lower court's determination that the Act does not impose a prior restraint on protected speech and that it does not create a permanent chill on protected expression.

### B.

Child pornography is a social concern that has evaded repeated attempts to stamp it out. State legislatures and Congress have vigorously tried to investigate and enact laws to provide a basis to prosecute those persons involved in the creation, distribution, and possession of sexually explicit materials made by or through the exploitation of children. Our concern is with the most recent federal law enacted as part of the effort to rid society of the exploitation of children for sexual gratification, the Child Pornography Prevention Act of 1996.

### 1.

The original federal legislation specifically prohibiting the sexual exploitation of children has been amended several times since it was enacted as the *Protection of Children Against Sexual Exploitation Act* of 1977. *See* Pub.L. No. 95–225, 92 Stat. 7 (1977) (codified as amended at 18 U.S.C. §§ 2251–2253). The conduct prohibited by this law criminalized using a minor to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct with the knowledge that it was or would be transported in interstate or foreign commerce. *See id.* Visual depiction was defined as including undeveloped film. *See United States v. Smith,* 795 F.2d 841, 846–47 (9th Cir.1986). The term also included reproductions of photographs or pictures. *See United States v. Porter,* 709 F.Supp. 770, 774 (E.D.Mich. 1989), *aff'd,* 895 F.2d 1415 (6th Cir.1990) (unpublished mem.). The language of 18 U.S.C. §§ 2251 and 2252 has survived overbreadth and vagueness challenges. *See, e.g., United States v. Reedy,* 845 F.2d 239, 241 (10th Cir.1988).

The Protection of Children Against Sexual Exploitation Act was enacted based upon congressional findings that child pornography and prostitution were highly organized, highly profitable, and exploited countless numbers of real children in its production. *See New York v. Ferber,* 458 U.S. 747, 749 n. 1, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (citing S.Rep. No. 95–438, at 5 (1977)). While the Act criminalized the commercial production and distribution of visual depictions of real children under the age of sixteen engaging in sexually explicit conduct, it also extended the prohibitions of the Mann Act, 18 U.S.C. §§ 2421–2424, so as to criminalize the interstate transportation of children or juveniles for the purpose of prostitution. *See* Pub.L. No. 95–225, § 3, 92 Stat. 7 (1977). The Act criminalized a broad range of sexual acts.

### 2.

The Protection of Children Against Sexual Exploitation Act had its problems. According to the Final Report of the Attorney General's Commission on Pornography, only one person was convicted under the Act's production prohibition. *See* Attorney General's Comm'n On Pornography, *Final Report* 604 (1986) (hereinafter "AG Report"). As a consequence of the law's deficiencies and the Supreme Court's ruling in *Ferber,* Congress enacted the Child Protection Act of 1984. *See* Pub.L. No. 98–292, 98 Stat. 204 (1984) (codified as

amended at 18 U.S.C. §§ 2251–2253). The Child Protection Act did away with the earlier requirement that the prohibited material be considered obscene under *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), before its production, dissemination, or receipt was criminal. *See id.* § 4. The Child Protection Act also raised the age limit for protecting children involved in the production of sexually explicit material from sixteen years to eighteen years. *See id.* § 5.

When the Child Protection Act of 1984 was enacted Congress recognized that a great deal of pornographic trafficking involving children was not for profit. Thus, the 1984 law also did away with the requirement that the production or distribution of the material be for the purpose of sale. *See id.* §§ 4, 5. The 1984 law also picked up on a key phrase from *Ferber,* where the Supreme Court discussed limits on the classification of child pornography, stating that the "nature of the harm to be combated requires that the state offense be limited to works that visually depict sexual conduct...." *Ferber,* 458 U.S. at 764, 102 S.Ct. 3348. Congress changed the phrase "visual or print medium" in the former law to the phrase "visual depiction." *See* Pub.L. No. 98–292, §§ 3, 4, 98 Stat. 204 (1984). Finally, Congress substituted the word "lascivious" for the word "lewd" in the definition of "sexual conduct" to make it clear that the depiction of children engaged in sexual activity was unlawful even if it did not meet the adult obscenity standard. *See id.* § 5.

### 3.

In 1986, Congress amended the law once again. The Child Sexual Abuse and Pornography Act of 1986, Public Law No. 99–628, § 2, 100 Stat. 3510 (1986) (codified as amended at 18 U.S.C. § 2251), banned the production and use of advertisements for child pornography. Another statutory change made wrongdoers subject to liability for personal injuries to children resulting from the production of child pornogra-phy. *See* Child Abuse Victims' Rights Act of 1986, Pub.L. No. 99–500, 100 Stat. 1783 (1986) (codified as amended at 18 U.S.C. § 2255). By passing these Acts, Congress continued its quest to end "kiddie porn."

### 4.

The continuing effort to marshal a means of stopping child pornography resulted in the passage of the Child Protection and Obscenity Enforcement Act of 1988. *See* Pub.L. No. 100–690, 102 Stat. 4181 (1988) (codified as amended at 18 U.S.C. §§ 2251A–2252). This law made it unlawful to use a computer to transport, distribute, or receive child pornography. *See id.* § 7511. It also added a new section to the criminal law that prohibited the buying, selling, or otherwise obtaining of temporary custody or control of children for the purpose of producing child pornography. *See id.* § 7512. The new law required record keeping and imposed disclosure requirements on the producers of certain sexually explicit matter. *See id.* § 7513.

### 5.

In 1990 the Supreme Court decided *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). *Osborne* upheld an Ohio law that prohibited possessing and viewing child pornography. *See* 495 U.S. at 111, 110 S.Ct. 1691. Soon thereafter, the Child Protection Restoration and Penalties Enhancement Act of 1990 was passed. *See* Pub.L. No. 101–647, § 301, 104 Stat. 4789 (1990) (codified as amended at 18 U.S.C. § 2252(a)(4)). This law criminalized the possession of three or more pieces of child pornography. *See id.* § 323. Again in 1994, the federal law concerning child pornography was amended to punish the production or importation of sexually explicit depictions of a minor. *See* Pub.L. No. 103–322, § 16001, 108 Stat. 2036 (1994) (codified as amended at 18 U.S.C. § 2259). But, as with all the predecessor protective laws, this statute protected real children from exploitation. *See id.*

The law also mandated restitution for victims of child pornography. *See id.* § 40113.

Throughout the legislative history, Congress has defined the problem of child pornography in terms of real children. Up until 1996 the actual participation and abuse of children in the production or dissemination or pornography involving minors was the *sine qua non* of the regulating scheme. The legislation tracked the decisions of the Supreme Court as well as the swift development of technology and its nearly infinite possibilities. The statutory odyssey was from adult pornography secured or not by the First Amendment, to child pornography permitted or not, to pseudo child pornography protected or not, until in 1996 the law was amended to prohibit virtual child pornography. The 1996 law, the law at issue here, changed course. The regulation direction shifted from defining child pornography in terms of the harm inflicted upon real children to a determination that child pornography was evil in and of itself, whether it involved real children or not. This shift forms the basis of the constitutional challenge Free Speech makes here.

### 6.

The Child Pornography Prevention Act of 1996 expanded the law to combat the use of computer technology to produce pornography containing images that look like children. The new law sought to stifle the use of technology for evil purposes. This of course was a marked change in the criminal regulatory scheme. Congress had always acted to prevent harm to real children. In the new law, Congress shifted the paradigm from the illegality of child pornography that involved the use of real children in its creation to forbid a "visual depiction" that "is, or appears to be, of a minor engaging in sexually explicit conduct." *See* 18 U.S.C.A. § 2256(8)(B) (West Supp.1999).

The premise behind the Child Pornography Prevention Act is the asserted impact of such images on the children who may view them. The law is also based on the notion that child pornography, real as well as virtual, increases the activities of child molesters and pedophiles.

### 7.

18 U.S.C. § 2256(8)[3] defines child pornography as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct[.]"[4] At issue in this appeal are the definitions contained in subsections (B) and (D) of § 2256(8). Section 2256(8)(B) bans sexually explicit depictions that appear to be minors. Section 2256(8)(D) bans visual depictions that are

**3.** 18 U.S.C. § 2256(8) defines child pornography as:

[A]ny visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where-
(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct;
(B) such visual depiction is, or appears to be, of a minor engaging in sexually explicit conduct;
(C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct; or

(D) such visual depiction is advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct....

**4.** "Sexually explicit conduct" means:
actual or simulated-
(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
(B) bestiality;
(C) masturbation;
(D) sadistic or masochistic abuse; or
(E) lascivious exhibition of the genitals or pubic area of any person.
18 U.S.C.A. § 2256(2) (West Supp.1999).

"advertised, promoted, presented, described or distributed in such a manner that conveys the impression" that they contain sexually explicit depictions of minors.

Because we hold the language at issue is unconstitutional, we do not consider the challenge to the affirmative defense in 18 U.S.C. § 2252A(c).[5]

### III.

■ Standing is a question of law reviewed de novo. *See Johns v. County of San Diego*, 114 F.3d 874, 876 (9th Cir. 1997). A party has standing to bring a claim before a court if the party has suffered " 'actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " *See The Free Speech Coalition*, 1997 WL 487758, at *2 (citing *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)).

■ The record shows the individuals and businesses within The Free Speech Coalition withheld or stopped distributing products out of fear that they would be prosecuted for such behavior. The district court was correct in finding the facts presented here are sufficient to confer standing. The government does not question the district court's standing decision.

### IV.

### A.

■ A challenge to the constitutionality of a federal statute is reviewed de novo. *See Crawford v. Lungren*, 96 F.3d 380, 384 (9th Cir.1996). A district court's decision to grant summary judgment is reviewed de novo. *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir.1998). When the district court upholds a restriction on speech, we conduct an independent de novo examination of the facts. *See Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1209 n. 2 (9th Cir.1996).

### 1.

■ The district court held that the contested provisions of the Child Pornography Prevention Act are content-neutral regulations. *See The Free Speech Coalition*, 1997 WL 487758, at *7. The district judge reasoned that the law was passed to prevent the secondary effects of the child pornography industry, specifically the exploitation and degradation of children. *See id.* The court also found that the Act addressed the need to control child pornography because virtual pornography led to the encouragement of pedophilia and the molestation of children. *See id.* This reasoning was based on a finding that the CPPA is intended "to counteract the effect that [real or virtual child pornography] has on its viewers, on children, and to society as a whole." *Id.* The lower court expressly found the legislation was not intended to regulate or outlaw the ideas themselves. *See id.*

We do not agree. In *United States v. Hilton*, 167 F.3d 61, 68–69 (1st Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 115, 145 L.Ed.2d 98 (1999), the First Circuit found that the Act at issue was content-based because it expressly aims to curb a particular category of expression, child pornography, by singling out the type of expression based on its content and then banning it. The *Hilton* court's determination that blanket suppression of an entire

---

**5.** The CPPA, 18 U.S.C. § 2252A(c), provides an affirmative defense for violations of the Act if:

    (1) the alleged child pornography was produced using an actual person or persons engaging in sexually explicit conduct;

    (2) each such person was an adult at the time the material was produced; and

    (3) the defendant did not advertise, promote, present, describe, or distribute the material in such a manner as to convey the impression that it is or contains a visual depiction of a minor engaging in sexually explicit conduct.

type of speech is a content-discriminating act is a legal conclusion with which we agree. The child pornography law is at its essence founded upon content-based classification of speech.

The CPPA prohibits any sexually explicit depiction that "appears to be" of a minor or that is distributed or advertised in such a manner as to "convey the impression" that the depiction portrays a minor. Thus, the CPPA distinguishes favored from disfavored speech on the basis of the content of that speech. *See Crawford,* 96 F.3d at 384.

Part of the rationale for the Act is the congressional determination that "a major part of the threat to children posed by child pornography is its effects on the viewers of such material[.]" S.Rep. No. 104–358, at 17 (1996). The Congress surmised that "the effect is the same whether the child pornography consists of photographic depictions of actual children or visual depictions produced wholly or in part by computer." *Id.* One Senator referred to the notion that "[c]omputer imaging technology has given child pornographers a new way to create 'synthetic' child pornography which is virtually indistinguishable from 'traditional' child pornography." *Id.* at 26. This belief was then carried to its logical content-based conclusion that " 'synthetic' child pornography which looks real to the naked eye will have the same effect upon viewers as 'traditional' child pornography." *Id.*

The government contends the district court was right in finding that the law is content-neutral. The government argues that because Congress enacted the CPPA to address the secondary effects of speech appearing to depict children's sexual activity, this secondary-effects justification for the CPPA hinges upon the effect of pornography seemingly involving children upon its viewers.

■ When a statute restricts speech by its content, it is presumptively unconstitu-tional. *See Crawford,* 96 F.3d at 385. As the First Circuit determined in ˙ *Hilton:*

> The CPPA fails both tests for substantive neutrality: it expressly aims to curb a particular category of expression (child pornography) by singling out that type of expression based on its content and banning it. Blanket suppression of an entire type of speech is by its very nature a content-discriminating act. Furthermore, Congress has not kept secret that one of its motivating reasons for enacting the CPPA was to counter the primary effect child pornography has on those who view it.

167 F.3d at 68–69 (footnote omitted). The CPPA is not a time, place, or manner regulation.

2.

■ Under the circumstances, if the CPPA is to survive the constitutional inquiry the government must establish a compelling interest that is served by the statute, and it must show that the CPPA is narrowly tailored to fulfill that interest. *See Crawford,* 96 F.3d at 385–86.

The district court found that even if no children are involved in the production of such materials the devastating secondary effect that sexually explicit materials involving the images of children have on society, and on the well being of children, merits the regulation of such images. *See The Free Speech Coalition,* 1997 WL 487758, at *4. This legislative finding supported the lower court's finding of a compelling state interest. *See id.* We believe this legal determination is wrong.

There are three compelling interests put forward when instituting efforts to curb child pornography using images of actual children. The first interest is that child pornography requires the participation of actual children in sexually explicit situations to create the images. The second interest stems from the belief that dissemination of such pornographic images may encourage more sexual abuse of children because it whets the appetite of pedo-

philes. The third interest is that such images are morally and aesthetically repugnant.

The Supreme Court has required state statutes criminalizing child pornography to limit the offense to "works that visually depict explicit sexual conduct by children below a specified age." *Ferber*, 458 U.S. at 764, 102 S.Ct. 3348. The *Ferber* Court specifically focused on the harm to children. *See* 458 U.S. at 758, 102 S.Ct. 3348. It also found that distribution of pornographic images is "intrinsically related" to the harm suffered by child victims because the images produced are a permanent record of the child's participation, exacerbated by its dissemination. *See id.* at 759, 102 S.Ct. 3348. The Court reasoned that the distribution network for such images needs to be terminated if it is to be effectively controlled. *See id.* The *Ferber* Court acknowledged that "if it were necessary for literary or artistic value, a person over the statutory age who perhaps looked younger could be utilized." *Id.* at 763, 102 S.Ct. 3348.

■ The language of the statute questioned here can criminalize the use of fictional images that involve no human being, whether that fictional person is over the statutory age and looks younger, or indeed, a fictional person under the prohibited age. Images that are, or can be, entirely the product of the mind are criminalized. The CPPA's definition of child pornography extends to drawings or images that "appear" to be minors or visual depictions that "convey" the impression that a minor is engaging in sexually explicit conduct, whether an actual minor is involved or not. The constitutionality of this definition is not supported by existing case law.

**6.** The dissent rhetorically asks "Why should virtual child pornography be treated differently than real child pornography?" and then suggests there is no "value" in any pornography involving children, whether it involves real persons or imaginary computer images.

■ The rationale articulated in *Ferber* and the constitutional permissibility of regulating the category of child pornography as a separate class is not justified by consideration of the effects such images have on others, even if those effects exist. Instead the focus of analysis is on the harm to the children actually used in the production of the materials.[6] Nothing in *Ferber* can be said to justify the regulation of such materials other than the protection of the actual children used in the production of child pornography. The language of the statute criminalizes even those materials that do not involve a recognizable minor. This shift is a significant departure from *Ferber*. While the government is given greater leeway in regulating child pornography, materials or depictions of sexual conduct "which do not involve live performance or photographic or other visual reproduction of live performances, retain[s] First Amendment protection." *Ferber*, 458 U.S. at 765, 102 S.Ct. 3348.

Ferber considered the possibility of simulations of sexually explicit acts involving non-recognizable minors and implicitly found them to be constitutionally protected. *See id.* at 763, 102 S.Ct. 3348. The Court also implicitly rejected the regulation of pornography that does not involve minors. *See id.* Thus, the case law demonstrates that Congress has no compelling interest in regulating sexually explicit materials that do not contain visual images of actual children. Furthermore, to the extent Congress' justification for the CPPA relies upon such pornography's effect on third parties-children victimized by pedophiles who consume sexually explicit depictions that appear to involve minors-the Seventh Circuit has articulated a compelling reason for preventing such third party injury from superseding First Amendment rights.

This is the critical fault in the secondary effects analysis because it shifts the argument focus from whether the questioned speech or images are constitutionally protected to a focus on how the speech or image affects those who hear it or see it.

In *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 334 (7th Cir.1985), *aff'd*, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986), the Seventh Circuit invalidated a city ordinance prohibiting pornography that portrayed women submissively or in a degrading manner. In *Hudnut*, an argument about the consequences of pornography was put forth to justify the Indianapolis ordinance. *See* 771 F.2d at 328. The defendants maintained that pornography influences attitudes, and that the ordinance was a way to alter the socialization of men and women rather than to vindicate community standards of offensiveness. *See id.* at 328–29. It was argued that the ordinance would play an important role "in reducing the tendency of men to view women as sexual objects, a tendency that leads to both unacceptable attitudes and discrimination in the workplace and violence away from it." *Id.* at 325. The Court accepted the premise that "depictions of subordination tend to perpetuate subordination" which in turn leads to "affront and lower pay at work, insult and injury at home, and battery and rape on the streets." *Id.* at 329. Even so, the *Hudnut* court reasoned that pornography's role, if any, in preserving systems of sexual oppression "simply demonstrate[d] the power of pornography as speech.... Pornography affects how people see the world, their fellows, and social relations." *Id.*

As the Seventh Circuit noted, however, the unhappy effects of pornography depend on mental intermediation. *See id.* This is particularly so when the images are not of real human beings, but are representations of a loathsome mind reduced to virtual reality by the technology of graphic computer art. Further,

> Sexual responses often are unthinking responses, and the association of sexual arousal with the subordination of women therefore may have a substantial effect. But almost all cultural stimuli provoke unconscious responses.... If the fact that speech plays a role in a process of

conditioning were enough to permit governmental regulation, that would be the end of freedom of speech.

*Id.* at 330.

By the same token, any victimization of children that may arise from pedophiles' sexual responses to pornography apparently depicting children engaging in explicit sexual activity is not a sufficiently compelling justification for CPPA's speech restrictions. This is so because to hold otherwise enables the criminalization of foul figments of creative technology that do not involve any human victim in their creation or in their presentation. *Cf. Jacobson v. United States*, 503 U.S. 540, 548–49, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) (invalidating a federal child pornography conviction and holding that even the compelling interest in protecting children from sexual exploitation does not justify modifications in otherwise applicable rules of criminal procedure); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (interpreting 18 U.S.C. § 2252 to require the prosecution to prove the defendant knew the material was produced with the use of a minor, in part because to find otherwise would be constitutionally problematic).

The critical ingredient of our analysis is the relationship between the dissemination of fabricated images of child pornography and additional acts of sexual abuse. Factual studies that establish the link between computer-generated child pornography and the subsequent sexual abuse of children apparently do not yet exist. *See* Ronald W. Adelman, *The Constitutionality of Congressional Efforts to Ban Computer-Generated Child Pornography: A First Amendment Assessment of S. 1237*, 14 J. Marshall J. Computer & Info. L. 483, 488, 490 (1996). The legislative justification for the proposition was based upon the Final Report of the Attorney General's Commission on Pornography, a report that predates the existing technology. *See id.* at 490. The Final Report emphasized the victimization of real children by adult dis-

tribution of the pornographic material. The report shows that the use of sexually explicit photos or films of actual children to lure other children played a small part in the overall problem involving harm to children. *See id.* (citing AG Report at 649–50). Thus, while such images are unquestionably morally repugnant, they do not involve real children nor is there a demonstrated basis to link computer-generated images with harm to real children. Absent this nexus, the law does not withstand constitutional scrutiny.[7]

■■■ By criminalizing all visual depictions that "appear to be" or "convey the impression" of child pornography, even where no child is ever used or harmed in its production, Congress has outlawed the type of depictions explicitly protected by the Supreme Court's interpretation of the First Amendment. Because the 1996 Act attempts to criminalize disavowed impulses of the mind, manifested in illicit creative acts, we determine that censorship through the enactment of criminal laws intended to control an evil idea cannot satisfy the constitutional requirements of the First Amendment.

Our determination is not to suggest that anyone condones the implicit or explicit harmful secondary effects of child pornography. Rather it is a determination to measure the statute by First Amendment standards articulated by the Supreme Court. To accept the secondary effects argument as the gauge against which the statute must be measured requires a re-

---

**7.** The dissent's argument about the secondary effects justification for permitting the statutory regulation here is not sound because it makes too much of dicta set forth in *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). In the first place *Osborne* involved real children. Protecting harm to real children is the point that constitutionally limits the power of Congress to ban some forms of expression.

The premise of the secondary effects argument assumes that children will be enticed by pedophiles to illicit sexual behavior, and consequent injury, if they look at pictures of other kids engaged in sexually explicit conduct. Even if the pictures don't involve real kids, the "realism" of computer images that "appear to be" or "create the impression" of real children can be used by pedophiles to entice a vulnerable child into illegal sexual acts. Thus, according to the dissent, there is a justification to protect kids from the harmful secondary effects of images that don't involve real people. The vulnerability argument makes no constitutional sense in light of *Ferber's* acknowledgment that adults who look like minors can be used in place of minors in sexually explicit "art" or film depictions. In other words, if the dissent's argument is sound, it would work to bar expression of constitutionally protected speech under *Ferber*. Nothing would keep the determined pedophile from using *Ferber* protected images to entice the vulnerable child into harmful sexual conduct.

A similar fault lies in the dissent's reasoning regarding "drawings, cartoons, sculptures, and paintings depicting youthful persons in sexually explicit poses [that] plainly lie be-

yond the Act," citing *Hilton*, 167 F.3d at 72. Children are enamored by cartoons and drawings. They are regularly used as a means of teaching and entertaining. Much debate exists about the effects that cartoons and video or computer games have on violent behaviors or other antisocial behaviors involving children. It is unsound to reason that cartoons cannot suggest pornographic behavior or that cartoons could not be used to entice a vulnerable child into illicit sexual behavior. *Cf. Fritz the Cat* (1972) (X-rated cartoon movie, loosely based on Underground Comics' character by Robert Crumb, depicting cat's adventures in group sex, college radicalism, and other hazards of life in the 1960's).

Many innocent things can entice children into immoral or offensive behavior, but that reality does not create a constitutional power in the Congress to regulate otherwise innocent behavior. By the dissent's reasoning a pedophile could use cartoons depicting explicit sexual conduct involving minors to entice a child into engaging in sexually explicit behavior but this would "plainly lie beyond the Act." Cartoons or other images cannot be constitutionally distinguished from other fictional images based upon the quality of the realism.

The dissent wrongly suggests that our holding accords "virtual child pornography the full protection of the First Amendment." Because the statute is severable, our holding demonstrates that if morphed computer images are of an identifiable child, the statute is enforceable because there is then the potential for harm to a real child.

markable shift in the First Amendment paradigm. Such a transformation, how speech impacts the listener or viewer, would turn First Amendment jurisprudence on its head.

In short, we find the articulated compelling state interest cannot justify the criminal proscription when no actual children are involved in the illicit images either by production or depiction. Because we find that Congress has not provided a compelling interest, we do not address the "narrow tailoring" requirement.

### 3.

The district court found the CPPA is not unconstitutionally vague as it gives sufficient guidance to a person of reasonable intelligence as to what it prohibits. *See The Free Speech Coalition,* 1997 WL 487758, at *6. The *Hilton* court scrutinized the statute with a "skeptical eye" because the new law impinges on freedom of expression. *See* 167 F.3d at 75. In doing so, it concluded, as the district court did here, that the CPPA was not unconstitutionally vague. *See id.* at 76–77. In making its determination the First Circuit applied an objective standard to determine the meaning of the phrase, "appears to be a minor." *See id.* at 75.

A statute is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary or discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The requirement involves an understanding by a putative actor about what conduct is prohibited. It is impermissible to define a criminal offense so vaguely that an ordinary person is left guessing about what is prohibited and what is not. Notice that does not provide a meaningful understanding of what conduct is prohibited is vague and unenforceable. Such is the case with the statutory language prohibiting materi-

al that "appears to be" or that "conveys the impression."

The CPPA's criminalizing of material that "appears to be a minor" and "convey[s] the impression" that the material is a minor engaged in explicit sexual activity, is void for vagueness. It does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," and it fails to provide explicit standards for those who must apply it, "with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The two phrases in question are highly subjective. There is no explicit standard as to what the phrases mean. The phrases provide no measure to guide an ordinarily intelligent person about prohibited conduct and any such person could not be reasonably certain about whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution.

In the same light, the absence of definitions for these key phrases in the CPPA allows law enforcement officials to exercise their discretion, subjectively, about what "appears to be" or what "conveys the impression" of prohibited material. Thus, the vagueness of the statute's key phrases regarding computer images permits enforcement in an arbitrary and discriminatory fashion. *Cf. City of Chicago v. Morales,* —— U.S. ——, ——, 119 S.Ct. 1849, 1862, 144 L.Ed.2d 67 (1999) (finding anti-loitering ordinance unconstitutionally vague, in part because "the 'no apparent purpose' standard [used in defining 'loitering'] is inherently subjective" and "depends on whether some purpose is 'apparent' to the officer on the scene.").

### 4.

The district court held that the CPPA is not overbroad because it prohibits only those works necessary to prevent the secondary pernicious effects of child

pornography from reaching minors. *See The Free Speech Coalition,* 1997 WL 487758, at *6. In addition, the First Circuit reasoned that "a few possibly impermissible applications of the Act does not warrant its condemnation[,]" and found that "[w]hatever overbreadth may exist at the edges are more appropriately cured through a more precise case-by-case evaluation of the facts in a given case." *Hilton,* 167 F.3d at 74. We do not agree.

■ Although overbreadth must "be 'substantial' before the statute involved will be invalidated on its face[,]" *Ferber,* 458 U.S. at 769, 102 S.Ct. 3348, such overbreadth is present here. On its face, the CPPA prohibits material that has been accorded First Amendment protection. That is, non-obscene sexual expression that does not involve actual children is protected expression under the First Amendment. *See id.* at 764–65, 102 S.Ct. 3348. This rule abides even when the subject matter is distasteful.

Congress may serve its legitimate purpose in protecting children from abuse by prohibiting pornography actually involving minors. The Senate considered the constitutional impediment discussed here but disagreed with the assertion that it could not prohibit visual depictions that "appear to be" of minors engaging in sexually explicit conduct when the depictions were produced without using actual children. *See* S.Rep. No. 104–358, at 21 (1996). The Senate reasoned that advances in technology distinguished the *Ferber* Court's holding because in 1982 when *Ferber* was decided "the technology to produce visual depictions of child sexual activity indistinguishable from unretouched photographs of actual children engaging in 'live performances' did not exist." *Id.*

The danger with this analysis is that it suggests that the more realistic an imaginary creation is, the less protection it is entitled to under the First Amendment. This is not because of any harm caused in its creation, rather it is because of the consequences of its purported reality.

Yet, the Supreme Court has restricted the regulation of pornographic material involving minors because of the harm caused by its creation, not necessarily because of the consequences of its creation. The government's interest in prohibiting computer-generated child pornographic depictions is not the same as its interest in prohibiting child pornography produced by using actual children. In the latter instance there may be direct and indirect harm to a child. In the former instance there is no harm, and there can be none, to an actual child, if no real human is used in the production of the images. What is left then is an inconsistent effort to regulate the evil consequences of abusing children to make such images, even though no children are used in its production.

As explained, the CPPA is insufficiently related to the interest in prohibiting pornography actually involving minors to justify its infringement of protected speech. *See Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 637–39, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (village could serve its legitimate interest in preventing fraud by less intrusive measures than direct prohibition of solicitation; concluding that village ordinance was overbroad, as it had insufficient relationship with protection of public safety or residential privacy to justify interference with protected speech). The CPPA's inclusion of constitutionally protected activity as well as legitimately prohibited activity makes it overbroad. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (describing Supreme Court's findings of overbreadth in cases in which statutes burden protected speech and rights of association).

5.

The district court found that because the CPPA does not require advance approval for production or distribution of adult pornography that does not use minors and does not effect a complete ban on constitutionally protected material, it does not con-

stitute an improper prior restraint on speech. *See The Free Speech Coalition,* 1997 WL 487758, at \*7. We agree.

■■■■ Prior restraint describes "administrative and judicial orders forbidding certain communications" before the communication occurs. *See Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). The CPPA only penalizes speech after it occurs. As such it is not a prior restraint of speech. *See id.* at 553–54, 113 S.Ct. 2766. The possibility of self-censorship and the contention that the CPPA has a chilling effect do not amount to a prior restraint. *See Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 60, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989).

### V.

■■■■ We hold that the language of "appears to be a minor" set forth in 18 U.S.C. § 2256(8)(B) and the language "convey[s] the impression" set forth in 18 U.S.C. § 2256(8)(D) are unconstitutionally vague and overbroad. The statute is severable. *See* Pub.L. No. 104–208, 110 Stat. 3009, § 101 (1996). The law is enforceable, ex-

cept for these amendments to 18 U.S.C. § 2256, § 4 of Senate Bill 1237, through the free standing savings provisions of § 9, codified at 18 U.S.C. § 2256(9).[8]

The judgment of the district court is AFFIRMED on the questions of standing and prior restraint. The judgment of the district court is REVERSED on the questions of the constitutionality of the statutory language "appears to be a minor" and "convey[s] the impression."

The pending motion by Stop Prisoner Rape, to file an amicus brief in this case, is denied.

The case is remanded to the district court with instructions to enter judgment on behalf of the plaintiffs consistent with this opinion.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

**FERGUSON, Circuit Judge, Dissenting:**

The majority holds that Congress cannot regulate virtual child pornography[1] because it does not require the use of actual children in its production. Majority Op. at 1095. Without the use of actual children, the majority believes that Con-

---

**8.** The Senate specifically dealt with the notion that the inclusion of entirely computer-generated images might render the law unconstitutional. Section 9 of Senate Bill 1237, codified at 18 U.S.C. § 2256(9), was added as a safeguard at the behest of Senator Biden. *See* S.Rep. No. 104–358, at 28 (1996). Section 9 prohibits the use of "identifiable minors in visual depictions of sexually explicit conduct." 18 U.S.C.A. § 2256(9) (West Supp. 1999). Section 9 was added because of the concern that the definition of "child pornography" and its application through § 4 of the Act, the language at issue here, "may be at risk of judicial invalidation insofar as it reaches images that do not depict actual minors." S.Rep. No. 104–358, at 11 (1996).

**1.** Computer-generated child pornography comes in many different forms. For purposes of clarity, however, I will divide it into two categories. The first is "virtual" child pornography and the second is "computer-altered" child pornography.

The key to virtual child pornography is that it does not depict an actual or "identifiable minor." Through a technique called "morphing," a picture of a real person is transformed into a picture of a child engaging in sexually explicit activity. *See* S.Rep. No. 104–358, at 15–16. Although the computer-generated image looks real, the children depicted in the image do not actually exist. *See id.* The picture is therefore 100% "virtual."

Computer-altered child pornography, by contrast, contains the image of an actual or "identifiable minor." This type of child pornography can be created by scanning a photograph of a child into the computer and then manipulating the picture so that the child's face appears on the body of another person who is engaged in sexually explicit activity. *See id.* Despite the alteration to the picture, the child is still "recognizable." *See* 18 U.S.C.A. § 2256(9) (West Supp.1999). Computer-altered child pornography is banned under 18 U.S.C.A. § 2256(8)(C) (West Supp. 1999). Appellants did not challenge this pro-

gress is simply attempting to regulate "evil idea[s]." *Id.* I disagree. Congress has provided compelling evidence that virtual child pornography causes real harm to real children. As a result, virtual child pornography should join the ranks of real child pornography as a class of speech outside the protection of the First Amendment. In addition, I do not believe that the statutory terms "appears to be" or "conveys the impression" are substantially overbroad or void for vagueness. Accordingly, I would find the Child Pornography Prevention Act of 1996 ("CPPA") constitutional.

## I.

For more than two decades, Congress has been trying to eliminate the scourge of child pornography. *See* Majority Op. at 1087 – 89. Each time Congress passes a law, child pornographers find a way around the law's prohibitions. *See* S.Rep. No. 104–358, at 26 (statement of Sen. Grassley). This cycle recently repeated itself and prompted Congress to enact the CPPA.

Prior to the CPPA, federal law imposed penalties on individuals who produced, distributed, or possessed visual depictions of actual minors engaging in sexually explicit conduct. *See* 18 U.S.C.A. § 2252 (West Supp.1999). Recent advances in computer-imaging technology, however, have made this law ineffective for two reasons. First, purveyors of child pornography can now produce visual depictions that appear to be actual children engaged in sexual conduct "without using children" at all, "thereby placing such depictions outside the scope of federal law." 141 Cong. Rec. S13542 (daily ed. Sept. 13, 1995) (remarks of Sen. Hatch). Second, even where actual children are used, computers can "alter sexually explicit photographs, films, and videos in such a way as to make it virtually impossible for prosecutors to identify individuals, or to prove that the offending

material was produced using [actual] children." *Id.*

In an effort to close these loopholes, Congress enacted the CPPA which, *inter alia*, bans visual depictions that "appear[ ] to be of a minor engaging in sexually explicit conduct" or that are "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct." 18 U.S.C.A. §§ 2256(8)(B), (D) (West Supp.1999). Along with the CPPA, Congress included thirteen detailed legislative findings that explained why virtual child pornography must be prohibited. *See* 18 U.S.C.A. § 2251 (West Supp.1999), Historical and Statutory Notes, Congressional Findings (hereinafter *"Congressional Findings"*).[2]

Despite these detailed legislative findings, the majority rules that Congress failed to articulate a "compelling state interest" to justify criminalizing virtual child pornography. Majority Op. at 1095. The majority argues that Congress cannot constitutionally regulate virtual child pornography because it does not depict "actual children." *Id.* Once "actual children" are eliminated from the equation, the majority believes that Congress is impermissibly trying to regulate "evil idea[s]." *Id.* I disagree for the following reasons.

*First.* The majority improperly suggests that preventing harm to depicted children is the only legitimate justification for banning child pornography. Although this was the Supreme Court's focus in *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), the Court has subsequently indicated a willingness to consider additional factors. *See Osborne v. Ohio*, 495 U.S. 103, 110–11, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). In *Osborne*, the Supreme Court addressed the issue of whether Ohio could ban the possession of

vision, and therefore, it will not be discussed here.

**2.** The congressional findings were based in large part on testimony presented to the Sen-

ate Judiciary Committee. *See Child Pornography Prevention Act of 1995: Hearing before the Senate Judiciary Committee*, 104th Cong., 2d Sess. (1996) (hereinafter *"Senate Hearing"*).

child pornography. *Id.* at 108, 110 S.Ct. 1691. In finding it could, the Court relied not only on the harm caused to the children who are used in its production (i.e., *Ferber*), but also on the harm that children suffer when child pornography is used to seduce or coerce them into sexual activity. *Id.* at 111, 110 S.Ct. 1691. Thus, in *Osborne,* the Court indicated that protecting children who are not actually pictured in the pornographic image is a legitimate and compelling state interest. *See Id. See also United States v. Hilton,* 167 F.3d 61, 70 (1st Cir.) (recognizing the Supreme Court's "subtle, yet crucial, extension" of valid state interests to include protecting children not actually depicted), *cert. denied* —— U.S. ——, 120 S.Ct. 115, —— L.Ed.2d —— (1999).

*Second.* The majority ignores the fact that the Supreme Court has already endorsed many of the justifications Congress relied on when it passed the CPPA. As discussed above, the Court in *Osborne* recognized that states have a legitimate interest in preventing pedophiles from "us[ing] child pornography to seduce other children into sexual activity." *Osborne,* 495 U.S. at 111, 110 S.Ct. 1691. Relying on this justification, Congress enacted the CPPA after finding that "child pornography is often used as part of a method of seducing other children into sexual activity; a child who is reluctant to engage in sexual activity with an adult, or to pose for sexually explicit photographs, can sometimes be convinced by viewing depictions of other children 'having fun' participating in such activity." *Congressional Findings,* at 3. More importantly, Congress found that when child

pornography is "used as a means of seducing or breaking down a child's inhibitions," the images are equally as effective regardless of whether they are real photographs or computer-generated pictures that are "virtually indistinguishable." *Congressional Findings,* at 8.[3]

The Supreme Court has also recognized that states have a legitimate interest in destroying the child pornography market. *Osborne,* 495 U.S. at 110. Similarly, in enacting the CPPA, Congress declared that the statute would encourage people to destroy all forms of child pornography, thereby reducing the market for the material. *Congressional Findings* at 12. At the hearing before the Senate Judiciary Committee, witnesses testified that persons who trade and sell images that are indistinguishable from those of actual children engaged in sexual activity "keep the market for child pornography thriving." *Senate Hearing,* at 91 (testimony of Bruce Taylor).[4] This is because pictures that *look* like children engaging in sexual activities can be exchanged for pictures that *are* of actual children engaging in such activities. By limiting the production and distribution of images that appear to be of children having sex, the CPPA helps rid the market of all child pornography.[5]

*Third.* Even though Congress presented some new justifications that the Supreme Court has not specifically endorsed, the majority still had an obligation to consider them, especially if they advance the goal of protecting children. In both *Ferber* and *Osborne,* the Court stated that "[i]t is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *Osborne,* 495 U.S.

---

**3.** *See also Senate Hearing,* at 70 (statement of Bruce Taylor, Chief Counsel for the National Law Center for Children and Families) (stating that "real and apparent [child pornography] ... are equally dangerous because both have ... the same seductive effect on a child victim").

**4.** *See also Senate Hearing,* at 35 (testimony of Dr. Victor Cline, Emeritus Professor in Psychology at the University of Utah); *Id.* at 20, 23, 30 (testimony of Jeffrey J. Dupilka, Deputy

Chief Postal Inspector for Criminal Investigations).

**5.** *See Senate Hearing,* at 122 (testimony of Professor Frederick Schauer, Frank Stanton Professor of the First Amendment, Kennedy School of Government, Harvard University) (stating that it is "undoubtedly true" that "somewhere in this chain of computer-generated production there are going to be real children ... involved").

at 109, 110 S.Ct. 1691, quoting *Ferber,* 458 U.S. at 756–57, 102 S.Ct. 3348. "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Ferber,* 458 U.S. at 757, 102 S.Ct. 3348. Thus, the Court will generally "sustain[ ] legislation aimed at protecting the physical and emotional well-being of children even when the laws ... operate[ ] in sensitive areas." *Id.*

The lesson from *Ferber* and *Osborne* is that legislators should be given "greater leeway" when acting to protect the well-being of children. *See Id.* at 756, 102 S.Ct. 3348. The majority, however, ignores this principle and fails to consider any of the new justifications supporting the CPPA. For example, the majority fails to address Congress' concern that computer-imaging technology is making it increasingly difficult in criminal cases for the government "to meet its burden of proving that a pornographic image is of a real child." S.Rep. No. 104–358, at 20. At a hearing before the Senate Judiciary Committee, Deputy Assistant Attorney General Kevin Di Gregory told the committee that in one federal child pornography case, the defendant relied on advances in computer technology to argue that the government had failed to meet its "burden of proving that each item of the alleged child pornography did, in fact, depict an actual minor rather than an adult made to look like one." *Id.* at 17, citing *United States v. Kimbrough,* 69 F.3d 723, 733 (5th Cir.1995), *cert. denied,* 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996). Although jurors in that case rejected this argument, Congress recognized that as computer imaging software progressed, similar arguments might undermine "the enforcement of existing laws" by raising a "built-in reasonable doubt argument in every child exploitation/pornography prosecution." S.Rep. No. 104–358, at 16-17. Congress believed that the CPPA was necessary to close this loophole, and therefore, the majority should have factored this concern into its evaluation of the case.

*Fourth.* The majority ignores the fact that child pornography, real or virtual, has little or no social value. *See Ferber,* 458 U.S. at 762, 102 S.Ct. 3348 (stating that the value of child pornography is "exceedingly modest, if not de minimis"). It is well established that "[t]he protection given to speech and press was fashioned to assure unfettered interchange of ideas for bringing about the political and social changes desired by people." *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). "All ideas having even the slightest redeeming social importance—unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion—have ... full protection ..." *Id.* The First Amendment, however, does not protect certain limited categories of speech that are "utterly without redeeming social importance." *Id. See also R.A.V. v. City of St. Paul,* 505 U.S. 377, 382–83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (stating that "[f]rom 1791 to present ... our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas"). These categories include obscenity, *Roth,* 354 U.S. at 483, 77 S.Ct. 1304, libel, *Beauharnais v. Illinois,* 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952), and "fighting words," *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–73, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Child pornography is also one of these categories of speech. *Ferber,* 458 U.S. at 763–64, 102 S.Ct. 3348.

Why should virtual child pornography be treated differently than real child pornography? Is it more valued speech? I do not think so. Both real and virtual child pornography contain visual depictions of children engaging in sexually explicit activity. The only difference is that real child pornography uses actual children in its production, whereas virtual child pornography does not. While this distinction is noteworthy, it does not somehow transform virtual child pornography into mean-

ingful speech. Virtual child pornography, like its counterpart real child pornography, is of "slight social value" and constitutes "no essential part of the exposition of ideas." *See Chaplinsky,* 315 U.S. at 572, 62 S.Ct. 766. Therefore, the majority is wrong to accord virtual child pornography the full protection of the First Amendment.

*Fifth.* The majority improperly analyzes the CPPA under a strict scrutiny approach. Majority Op. at 1091. In so doing, the majority misreads the Supreme Court's previous child pornography decisions. These decisions indicate that the proper mode of analysis is to weigh the state's interest in regulating child pornography against the material's limited social value. *See Ferber,* 458 U.S. at 756–64, 102 S.Ct. 3348; *Osborne,* 495 U.S. at 108–111, 110 S.Ct. 1691. The Supreme Court used this test in *Ferber* and found that "the balance of competing interests [was] clearly struck and that it [was] permissible to consider these materials as without the protection of the First Amendment." *Id.* at 764, 102 S.Ct. 3348. *See also Osborne,* 495 U.S. at 111, 110 S.Ct. 1691 (finding that the "gravity of the State's interests" outweighed Osborne's limited First Amendment right to possess child pornography).

Virtual child pornography should be evaluated in a similar fashion. The majority should have weighed Congress' reasons for banning virtual child pornography against the limited value of such material.[6] If the majority had, it would have realized that Congress' interests in destroying the child pornography market and in preventing the seduction of minors outweigh virtual child pornography's exceedingly modest social value. Since the balance of competing interests tips in favor of the government, virtual child pornography should join the ranks of real child pornography as

a class of speech outside the protection of the First Amendment.

## II.

The analysis does not end with a finding that virtual child pornography is without First Amendment protection. Statutes can be found unconstitutional if they are worded so broadly that they "criminalize an intolerable range of constitutionally protected conduct." *Osborne,* 495 U.S. at 112, 110 S.Ct. 1691. This case focuses on the CPPA's new definition of child pornography which prohibits visual depictions that "appear[ ] to be," or are promoted or distributed "in such a manner that conveys the impression," that they are "of a minor engaging in sexually explicit conduct." 18 U.S.C.A. §§ 2256(8)(B), (D) (West Supp. 1999). The majority holds that this language is overbroad because it bans "material that has been accorded First Amendment protection." Majority Op. at 1095–96. I disagree.

As a general rule, statutes should not be invalidated as overbroad unless the overbreadth is "substantial ... in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The Court has cautioned that the overbreadth doctrine is "strong medicine" that should be employed "sparingly and only as a last resort." *Id.* at 613, 93 S.Ct. 2908. Accordingly, a statute should not be invalidated as overbroad "when a limiting construction has been or could be placed on the challenged statute." *Id.*

Appellants suggest that the "appears to be" language is so broad that everyday artistic expressions like paintings, drawings, and sculptures that depict youthful looking subjects in a sexual manner will be criminalized 'under the CPPA. However,

---

**6.** Scholarly writers also support using a balancing test to determine whether virtual child pornography is "outside the protection of the First Amendment." *See e.g.* Adam J. Wasserman, *Virtual.Child.Porn.Com: Defending the Constitutionality of the Criminalization of Computer–Generated Child Pornography by the Child Pornography Prevention Act of 1996—A Reply to Professor Burke and Other Critics,* 35 Harv. J. on Legis. 245, 274–78 (1998).

even a glancing look at the legislative history belies this assertion. Congress enacted the CPPA to address the problem of "computer-generated" child pornography. S.Rep. No. 104–358, at 7. In the findings filed with the CPPA, Congress repeatedly stated that the law is targeted at visual depictions that are "virtually indistinguishable to the unsuspecting viewer from unretouched photographic images of actual children engaging in sexually explicit conduct." *Congressional Findings,* at 5, 8, 13. The Senate Judiciary Committee explained that the "appears to be" language was necessary to cover the "same type of photographic images *already* prohibited, but which do[ ] not require the use of an actual minor." S.Rep. No. 104–358, at 21 (emphasis in original).

From reading the legislative history, it becomes clear that the CPPA merely extends the existing prohibitions on "real" child pornography to a narrow class of computer-generated pictures easily mistaken for real photographs of real children. *See Congressional Findings,* at 13. Therefore, I agree with the United States Court of Appeals for the First Circuit which found that "drawings, cartoons, sculptures, and paintings depicting youthful persons in sexually explicit poses plainly lie beyond the Act." *Hilton,* 167 F.3d at 72. "By definition, they would not be 'virtually indistinguishable' from an image of an actual minor." *Id.* "The CPPA therefore does not pose a threat to the vast majority of every day artistic expression, even to speech involving sexual themes." *Id.*

There has also been concern that the CPPA prohibits constitutionally protected photographic images of adults in sexually explicit poses. This contention, however, is also without merit. The CPPA explicitly states that "[i]t shall be an affirmative defense" to a charge of distributing, reproducing or selling child pornography that the pornography (1) "was produced using an actual person or persons," (2) each of whom "was an adult at the time the mate-

rial was produced," and (3) "the defendant did not advertise, promote, present, describe, or distribute the material in such a manner as to convey the impression that it is or contains visual depictions of a minor engaging in sexually explicit conduct." 18 U.S.C.A. § 2252A(c) (West Supp.1999). The CPPA thus shields from prosecution sexually explicit visual depictions so long as they are produced using actual adults and "the material has not been pandered as child pornography." S.Rep. No. 104–358, at 10, 21. Persons—like the appellants in this case—who produce and distribute works depicting the sexual conduct of actual adults, and do not market the depictions as if they contain sexual images of children, are thus explicitly protected from culpability under the CPPA.

While there may be other potentially impermissible applications of the CPPA, I doubt that they would be "substantial ... in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908. Rather than invalidate part of the statute based on possible problems that may never occur, it is best to deal with those situations on a case-by-cases basis. *See Ferber,* 458 U.S. at 781, 102 S.Ct. 3348 (Stevens, J., concurring) (noting that "[h]ypothetical rulings are inherently treacherous and prone to lead us into unforeseen errors"). Accordingly, I would find that the CPPA is not substantially overbroad. *See Hilton,* 167 F.3d at 71–74 (finding that the CPPA is not unconstitutionally overbroad); *United States v. Acheson,* 195 F.3d 645, 650–52 (11th Cir.1999) (same).

**III.**

I also disagree with the majority that the CPPA is unconstitutionally vague. It is well settled that a statute is not void for vagueness unless it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

Here, the key phrases of the CPPA are clearly defined. The CPPA applies to visual depictions of a minor engaging in sexually explicit conduct. A minor is defined as "any person under the age of eighteen years." 18 U.S.C.A. § 2256(1) (West Supp.1999). In addition, "sexually explicit conduct" is defined as actual or simulated "sexual intercourse . . .; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area." 18 U.S.C.A. § 2256(2) (West Supp.1999). Given the detailed definition of sexually explicit activity, it is unlikely that a person of ordinary intelligence would be unable to determine what activities are prohibited.

The majority nevertheless finds fault with the CPPA because it believes that the terms "appears to be" and "conveys the impression" are highly subjective and could be enforced "in an arbitrary and discriminatory fashion." Majority Op. at 1095. Once again, I disagree. With regard to the apparent age of the depicted individuals, the government can use the same type of objective evidence that it relied on before the CPPA went into effect. For example, in cases involving prepubescent individuals, the government can show the jury the pictures and the jury can determine for itself whether the virtual image "appears to be" of a minor. *See e.g. United States v. Arvin*, 900 F.2d 1385, 1390 n. 4 (9th Cir.1990) (citing a jury instruction that requires the members of the jury to decide whether the prepubescent girls are "minors" based upon their own "observation of the pictures"), *cert. denied* 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991). In cases in which the depicted children have reached puberty, the government can call expert witnesses to testify as to the physical development of the depicted person, and present testimony regarding the way the creator, distributor, or possessor labeled the disks, files, or videos. *See e.g. United States v. Robinson*, 137 F.3d 652, 653 (1st Cir.1998) (noting that the pornographic photographs listed the ages of boys depicted). Based on these

examples, I agree with the First Circuit which found that the standard for evaluating the key provisions of the CPPA "is an objective one." *Hilton*, 167 F.3d at 75. "A jury must decide, based on the totality of the circumstances, whether an unsuspecting viewer would consider the depiction to be an actual individual under the age of eighteen engaging in sexual activity." *Id.*

As an additional safeguard against arbitrary prosecutions, the government must satisfy the element of scienter before it can obtain a valid conviction under the CPPA. *See* 18 U.S.C.A. § 2252A (West Supp.1999). In any CPPA prosecution, the government must prove beyond a reasonable doubt that the individual "knowingly" produced, distributed, or possessed sexually explicit material and that the material depicts a person who appeared to the pornographer to be under the age of eighteen. *See Id. See also United States v. X–Citement Video, Inc.*, 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) (holding that the scienter requirement "extends to both the sexually explicit nature of the material and to the age of the performers"). "Thus, a defendant who honestly believes that the individual depicted in the image appears to be 18 years old or older (and is believed by a jury), or who can show that he knew the image was created by having a youthful-looking adult pose for it, must be acquitted, so long as the image was not presented or marketed as if it contained a real minor." *Hilton*, 167 F.3d at 75–76. Based on these safeguards, the majority's concerns about arbitrary and discriminatory prosecutions are misplaced. *See Id.* at 74–77 (finding that the CPPA is not unconstitutionally vague); *Acheson*, 195 F.3d at 652–53 (same).

**IV.**

In sum, the CPPA is not, as the majority claims, an attempt to regulate "evil idea[s]." Instead, the CPPA is an impor-

tant tool in the fight against child sexual abuse. The CPPA's definition of child pornography provides adequate notice of the type of images that are prohibited and does not substantially encroach on protected expression. Accordingly, I would find the CPPA constitutional.