Richard P. HOBBS, Plaintiff–
Appellant,

v.

COUNTY OF WESTCHESTER and Mr. Montalto, Director of Playland Amusement Park, Defendants–Appel-lees.

No. 03–7985.

United States Court of Appeals, Second Circuit.

Argued: April 12, 2004.

Decided: Feb. 7, 2005.

Thomas H. Sear, New York, New York (Howard F. Sidman, Alexander S. Bokor, Jones Day, New York, New York, on the brief), for Plaintiff–Appellant.

Gary Silverman, New York, New York (O'Dwyer & Bernstein, New York, New York, on the brief) for Defendants–Appellees.

Before: NEWMAN, KEARSE, and SOTOMAYOR, Circuit Judges.

Judge NEWMAN concurs in the majority opinion and in a separate concurring opinion.

KEARSE, Circuit Judge.

Plaintiff Richard P. Hobbs appeals from so much of a judgment of the United States District Court for the Southern District of New York, then-*Judge* John S. Martin, Jr., as upheld the constitutionality of a provision in an executive order of defendant Westchester County (the "County") prohibiting the issuance of a permit for solicitation, performance, or demonstration in a public forum to a person previously convicted of a sexual offense against a minor if the effect of the solicitation, performance, or demonstration would be to entice a child to congregate around that person, *see* Westchester County, N.Y., Laws of Westchester County, Executive Order No. 3–2003 ("Westchester County Executive Order No. 3–2003" or "Executive Order 3–2003"), § VI, para. 2 (2003). The district court held, *inter alia*, that the prohibition is a content-based restriction on speech but that it does not violate the First Amendment because it is narrowly tailored to the compelling state interest of protecting children from sexual predators.

On appeal, Hobbs contends principally (a) that the prohibition is not narrowly tailored and hence violates the First Amendment both on its face and as applied to him, and (b) that the prohibition's automatic disqualification of convicted sex offenders against minors from eligibility for permits violates the *Ex Post Facto* Clause. The County argues that the decision of the district court may be upheld on the grounds, *inter alia*, that the prohibition is content-neutral and nonpunitive. For the reasons that follow, we affirm.

## I. BACKGROUND

Playland Park ("Playland") is a 279–acre recreational complex in Rye, New York, owned and operated by the County. The complex comprises (a) a pool, picnic areas and shelters, a miniature golf course, a beach, a boardwalk, a lake, an ice-skating rink, a museum, and a pier, and (b) in a separate walled-in area, an amusement section featuring rides, games, and concession stands. Entrance to the amusement park section is free, but there are charges for the rides, games, and concessions.

Hobbs describes himself as "a busker, a street performer, a balloon sculptor, an artist, a musician, a comedian, and public political speaker." (Complaint at 1.) *See also* Webster's Third New International Dictionary 303 (1976) (defining "busker" as "an itinerant entertainer"). This action involves Hobbs's desire to busk at Playland.

A. *Hobbs's First Application, Denied Based on County General Ordinance Number 2*

In a letter dated May 22, 2000, Hobbs wrote to defendant Joseph Montalto, Director of Playland, to "apply for whatever 'permit'" would be required, "if any," for Hobbs to "sit on a bench (or [his] own

chair) along a popularly traveled promenade at Playland, and perform [his] act and create balloon sculptures in the free exercise of ... free speech." (Letter from Hobbs to Montalto dated May 22, 2000 ("Hobbs Letter"), at 1.) The Hobbs Letter stated that Hobbs was

> an artist who performs a comical act and creates sculptures with Balloons. Members of the public hear my message and often support my artistic expression. Often when they do I give them my balloon sculptures. At other times, persons who value my sculptures offer me money for them, which I accept. These are activities that the courts have said are legal and do not constitute a commercial transaction that may be regulated by the government.

(*Id.*)

By letter dated May 26, 2000, Montalto denied Hobbs's request, viewing the Hobbs Letter as an application for a permit to allow soliciting. Montalto stated that Playland is not a public forum but an amusement facility operated by the County in its proprietary capacity; in that capacity, the County had authority "to adopt restrictive regulations on speech which are reasonable and not calculated to suppress expression because of disagreement with the speaker's view." (Letter from Montalto to Hobbs dated May 26, 2000 ("First County Letter"), at 1.) The letter stated that the County's

> General Ordinance Number 2, governing the use of County property provides in entirely neutral terms that: "No person shall solicit alms, subscriptions or contributions for any purpose." Laws of Westchester County, Section 712.51.

(First County Letter at 1.) This letter also stated that Playland had retained "strolling performers and puppeteers (who do not solicit contributions) to entertain its patrons," and that "[n]o other such per-

formances are authorized at Playland." (*Id.*) The letter indicated that the Ordinance would be "vigorously enforced" against Hobbs. (*Id.*)

## B. *The Present Action*

In an August 9, 2000 *pro se* complaint, Hobbs commenced the present action, alleging that the County's denial of his permit request violated his rights under the First Amendment, *inter alia,* and principally requesting declaratory relief and "an injunction against the Westchester County *Police preventing them from arresting Plaintiff for doing street performing at Playland Park*" (Complaint at 2 (emphasis in original)), so that he might "perform his balloon sculpturing and comedy routines to entertain passers-by as a busker along a public way" (*id.* at 3). Hobbs later also sought compensatory and punitive damages.

In describing Hobbs's busking act, the complaint alleges, *inter alia,* that Hobbs is a performer who "gives his entertainment to the public and presents his message to them for the public to enjoy" and that "[t]he messages often have political value, and or social value" (*id.* at 6). Hobbs's political message "comment[s] on government inefficiency. *He is criticizing the Government.* He is criticizing the daffiness of some civil servant controlled governmental processes. His message is political and critical of the government." (*Id.* at 12 (emphasis in original).) Hobbs

> is amongst other things commemorating the historic event where George Washington and his troops were wintering at Valley Forge. Washington sent a request to congress then in York, Pa. They needed help but not money. Send him shoes, food, and supplies. The congress responded by blindly sending him money. It was of no help because the British had bought up everything in the area

that might be needed for their troops. This speaks of how ridiculous things can get in our society from the indifference our form of government often allows.

(*Id.* at 13–14.)

The complaint alleges that Hobbs dresses almost like a homeless person (*see id.* at 13) and "keeps the 'homeless look' because it is also necessary to remind Americans on vacation enjoying the best of worlds that there are still those suffering homeless Americans out there. Some are veterans." (*Id.* at 14.) He also "promotes good will and honesty and obedience to parents and other valuable messages. He promotes diversity and universal acceptance of others. He discourages prejudice and pride . . . ." (*Id.* at 23.)

Hobbs alleges that "[t]he balloon is a tool through which he conveys his message" (*id.* at 13), and that his performance is particularly attractive to children (*see id.* at 12–15). His act is

a very unique form of interactive, improvisational comedy. It is art, which is created, in the very presence of the audience. The audience becomes a part of the show and the art. His particular form of *this art requires a very specific type of audience.* The performer-artist must mold and shape the dynamic audience and lead them into participating.

(*Id.* at 8 (emphasis in original).) Hobbs

tells the children he is an expert with balloons. Then he tries to blow it up from the wrong side. The Children often realize his dilemma and try to offer suggestions to him about how he might be more successful. They try to tell him to blow the balloon up on the other end. The more helpful they are to him the more he misunderstands them and the more ridiculous are his attempts to accomplish his task. The more they help him the worse it all gets. This eventual-

ly starts the children laughing. That in turn usually gets the adults laughing.

(*Id.* at 12.) The balloon

helps attract his audience and helps him relate to them. It creates a tie between those watching him and the artist. Now the artist would have to be a heel to have engaged the audience so greatly in the attempt to make the balloon sculpture and then just pop it or throw it away. Naturally the Balloon artist gives the balloon to a child.

(*Id.* at 13.)

The complaint also alleges that Hobbs's appearance repels adults but attracts children (*see id.* at 14). "Many parents gawk at [Hobbs] and try to avoid him," but

[s]ome of the children think he might be "Santa Clause" [*sic*] in disguise. The children often and some adults see the artist in him and look for something unusual and entertaining to happen. The children often looking from their hearts and imaginations recognize the gentle nature of this person. The children interact with him and try to help him.

(*Id.*) Further, the children's attraction to Hobbs is enduring:

Very many times parents come back the next day (when Plaintiff is in a tourist area where families have gone for a week vacation) and the parents come to the Plaintiff and apologize. They say "Gee. We did not think much of you or your antics. We were leery of you. But we now realize that you must be a really good artist. The only thing our children have done all day is ask us to bring them back so they could see you again tonight."

. . . .

There are others whose three or four year-olds sees [*sic*] the Plaintiff's show one time. The parents failed to see how

interesting it is to them. Then the parent sees Plaintiff, a year or two later and says, "Gee, I didn't realize how effective you are as a communicator. Our child has talked about you almost every day for a year after he met you. He often asked if we could come and see you again." (*Id.* at 14–15.) "[S]ome poor children . . . are fed emotionally or spiritually" by Hobbs's performance. (*Id.* at 24.)

The complaint also alleges that, in order to fund his act of giving his balloon sculptures to children, Hobbs needs to receive contributions from his audience. (*See, e.g., id.* at 19–21.) "He must tell [the audience] that he is not paid to be there and that if they appreciate his show they might want to give to support it." (*Id.* at 16.)

### C. *Hobbs's Second Application, Denied Based on New York State Correction Law § 752*

While the action was pending in the district court, the County learned that Hobbs was a repeat sex offender against minors; defendants amended their answer to the complaint to add that fact as a basis for denying Hobbs a permit to perform his busking act at Playland. They asserted that "as plaintiff has been convicted twice of crimes involving the sexual abuse of minors," "[d]efendants legally may refuse to issue a permit to plaintiff to perform his clown and balloon act at Playland, pursuant to New York State Correction Law § 752(1) and § 752(2)." (Second Amended Answer dated June 12, 2001, ¶ 47.) Those sections, which appear in Article 23–a of the Correction Law, provide, in pertinent part, that

[n]o application for any license or employment, to which the provisions of this article are applicable, shall be denied by reason of the applicant's having been previously convicted of one or more

criminal offenses . . . when such finding is based upon the fact that the applicant has previously been convicted of one or more criminal offenses, *unless:*

(1) *there is a direct relationship between one or more of the previous criminal offenses and the specific license or employment sought; or*

(2) *the issuance of the license or the granting of the employment would involve an unreasonable risk . . . to the safety or welfare of specific individuals or the general public.*

N.Y. Correction Law, Art. 23–a, §§ 752(1), (2) (McKinney 2003) (emphases added). Defendants later filed a further amended answer containing the following factual allegations in support of their invocation of these state-law sections:

49. Plaintiff has been convicted twice of crimes involving child molestation.

50. One of plaintiff's convictions involved molestation of a boy on a day when plaintiff was performing as a clown.

51. Defendants have learned that there are witnesses who will testify at the trial of this action that plaintiff molested other children who were not involved in plaintiff's prior convictions.

. . . .

53. Defendants believe that plaintiff's convictions for child molestation directly relate to the permit that he seeks to perform at Playland.

54. Defendants believe that plaintiff would pose a safety risk to the general public if he were to perform at Playland.

(Third Amended Answer dated February 4, 2002, ¶¶ 49–51, 53–54.)

In the meantime, Hobbs had again applied for a permit in 2001. Montalto wrote to Hobbs again denying a permit, stating that, in addition to relying on the County Ordinance cited in the First County Let-

ter, Playland was denying Hobbs's request because his convictions for sex offenses against minors rendered him ineligible for a permit under state law:

[Y]our request for a permit to perform at Playland is denied pursuant to New York State Correction Law §§ 752 and 753. You have been convicted of two crimes that bear a direct relationship to the permit you seek and the issuance of the permit would involve an unreasonable risk to the safety of the general public. Specifically, you were convicted of sexual abuse of a minor and corruption of a minor. Both offenses involved sexual contact with children.

It is my understanding that you wish to perform as a clown for children and hand them balloons. Thus, the permit you seek has a direct relationship to the crimes for which you were convicted. In addition, your involvement in a situation where you would interact with children presents an unreasonable safety risk to the general public.

(Letter from Montalto to Hobbs dated July 25, 2001 ("Second County Letter"), at 1.) This letter stated that Montalto had taken into account the factors listed in N.Y. Correction Law § 753 (entitled "Factors to be considered concerning a previous criminal conviction"), and had concluded that Hobbs should be denied a permit in light of "the direct relationship between the crimes for which [Hobbs was] convicted and the permit sought, and the safety risk presented by [Hobbs's] interaction with children." (Second County Letter at 1.)

D. *The Parties' Cross–Motions for Partial Summary Judgment*

The parties cross-moved for partial summary judgment. Hobbs, by then represented by counsel, contended that he was entitled to judgment principally on the basis that all of Playland is a traditional public forum in which he has an absolute right, under the First Amendment, to perform.

Defendants contended (a) that they were entitled to judgment on the grounds, *inter alia*, that Playland in its entirety is a nonpublic forum because the County operates it in a proprietary capacity, and (b) that the state-law provisions authorizing the denial of an employment license to a convicted criminal where granting such license would "involve an unreasonable risk to property or to the safety or welfare of specific individuals or the general public," N.Y. Correction Law § 752(2), provided an independent basis for excluding Hobbs from performing in the park. In support of their summary judgment motion, defendants submitted, *inter alia*, court records that described Hobbs's prior conduct leading to his two convictions for molestation of children; affidavits attesting to Hobbs's molestation of two other children; and an affidavit and report by clinical psychologist and psychology professor Dr. David L. Pogge, who had regularly conducted evaluations of sex offenders at the request of probation departments and courts, had evaluated approximately 600 such persons, and possessed "special expertise in the evaluation of sex offenders and the risk they present to the community" (Affidavit of David L. Pogge, Ph.D., dated April 26, 2002, ¶ 1).

In his affidavit, Dr. Pogge stated that "[s]exual offenders have a high rate of recidivism," and that "[c]ertain subgroups of sex offenders have a higher risk of reoffending." (*Id.* ¶ 2.) In his report attached to the affidavit, Dr. Pogge elaborated:

While sexual offenders in general are believed to have a relatively high recidivism rate, there are a number of factors that have been identified in the sci-

entific literature that predict increased risk to re-offend, and there are other factors that are known or generally believed to reduce an offender's risk of recidivism. *Factors that have been identified in the scientific literature on sexual offenders that increase risk of recidivism include,* but are not limited to, *number of sexual offenses,* number of other criminal offenses, non-sexual violence during a sexual offense, history of non-sexual violence, *the absence of a familial relationship between the offender and victim, offending against individuals who are strangers or little known to the offender, sexual offending against male victims. Offenders who are relatively young-that is, under the age of 25 at the time of their offense—have been found to be more likely to re-offend. Male offenders who have never been married or lived in a marital relationship with a partner for at least two years are also more likely to re-offend.* In addition, the available research suggests that offenders who manifest psychopathic or paranoid personality traits are more likely to re-offend. *Offenders who show deviant sexual arousal-particularly where there is evidence of pedophilic sexual interest, and most especially where there is evidence of homosexual pedophilic sexual interest—are also a significantly greater risk to re-offend.*

(Report of David L. Pogge, Ph.D., "Consultation Regarding Mr. Richard Hobbs" ("Pogge Report") at 4 (emphases added).)

The County presented evidence to support its contention that many of the above factors applied to Hobbs. Hobbs had been convicted of sexual offenses against minors twice; both involved his fondling the genital areas of young boys with whom he apparently had no familial relationship and little or no prior acquaintance. (*See, e.g., Commonwealth v. Hobbs,* No. 82–10,684, Court of Common Pleas, Lycoming County, Pa., Sentencing Transcript, March 8, 1983, at 19–20 (according to the New York State records of Hobbs's first conviction in 1978, as read into the record, without objection, by the judge who presided over Hobbs's trial and sentencing for his second conviction, Hobbs's 1978 conviction involved an 11–year–old boy who was walking along the street when he was "grabbed" by Hobbs, taken into an office, and fondled until he was able to break free and run for help); *id.* Trial Transcript, January 13–14, 1983, at 10–19 (the victim of the conduct leading to Hobbs's second conviction testified that he was 14 when he was introduced to Hobbs; on that day, Hobbs was to give a performance as a clown in another town and the victim was to help Hobbs in that act; Hobbs fondled him throughout the round-trip car ride and at locations in and near the other town).)

One of the two affidavits describing a molestation for which Hobbs had not been prosecuted was submitted by a man who stated that Hobbs had molested him when he was approximately 10 years old. That molestation was relatively contemporaneous with the conduct that led to Hobbs's 1983 conviction, and the affiant's father testified at Hobbs's trial. The other affidavit was submitted by a mother who stated that she had entered a room and found Hobbs fondling the genitals of her early-teen-age son; that incident occurred not long after Hobbs had completed the term of incarceration for his 1983 conviction.

Hobbs testified that he was 24 years old at the time of his first conviction in 1978. (*See* Deposition of Richard P. Hobbs at 87). As of the time of his deposition in this case in 2001, he had never been married. (*See id.* at 4.) He had never received any psychiatric treatment or been treated

by a psychologist or a behavioral therapist. (*See, e.g., id.* at 121–22.)

Dr. Pogge stated that he had reviewed the above trial, sentencing, and deposition transcripts, as well as hundreds of pages of other materials concerning Hobbs, including numerous documents written by Hobbs. Although he did not meet Hobbs in person, Dr. Pogge also reviewed some 2½ hours of Hobbs's own videotapes of his performances. (*See* Pogge Report at 1–3.) Dr. Pogge opined, "using a published actuarial algorithm," that certain of the facts described in the above transcripts—even without consideration of the victims' ages—

> would be sufficient to classify Mr. Hobbs as a Medium–to–High risk to re-offend and would predict a long term risk (i.e., 15 years) of re-conviction for a sexual offense of 40%.

(*Id.* at 4.) And either the victims' ages, *i.e.*, "early-adolescent" and "pre-adolescent," or the fact that the victims were males "would further increase [Hobbs's] risk for future sexual offending." (*Id.* at 5.) Dr. Pogge noted that "no factors known to reduce [Hobbs's] risk for re-offending (e.g., successful completion of appropriate treatment) are present" and that as a whole, the available information "suggest[ed] that Mr. Hobbs may present a special risk of sexual assault to minors, especially male minors." (*Id.* at 7.) Dr. Pogge also opined that

> [i]f, through his performances at Rye Playland, Mr. Hobbs[ ] were able to successfully present himself to large numbers of children and their guardians as a harmless, entertaining, benevolent clown, he would then be in an excellent position to begin identifying, targeting and "grooming" future victims.

(*Id.* at 5.)

E. *The Ruling in* Hobbs I

In an Opinion and Order dated December 23, 2002, the district court denied both parties' summary judgment motions. *See Hobbs v. County of Westchester*, 2002 WL 31873462, at *12 (S.D.N.Y. Dec.23, 2002) ("*Hobbs I*"). The court held that certain areas of Playland are public fora, that in those areas a total ban on solicitation could not stand, *see id.* at *8, and that "[t]o the extent that Plaintiff sought a permit to perform in a public forum area of Playland Park ... he had a First Amendment right to do so, and did not need a permit," *id.* at *2:

> While the amusement area of Playland Park is not a public forum and the County can prohibit Plaintiff from performing there, other parts of the park, which are removed from the amusement area, are no different from other public parks, which have consistently been held to be public fora in which the exercise of First Amendment rights may not be prohibited.

*Id.* Noting that defendants "apparently relied" on Westchester County Regulation § 765.261, *Hobbs I*, 2002 WL 31873462, at *8, a permit-requirement provision applying New York Correction Law § 752, the district court concluded that the permit provision "cannot constitutionally be applied to preclude Plaintiff from performing his act in public forum areas within Playland Park," *Hobbs I*, 2002 WL 31873462, at *12.

As to the amusement section of Playland, however, the court found that that area

> has all of the earmarks of a nonpublic forum. That area is run by the County with the intent of making a profit, whether or not it actually has succeeded in generating a profit in any given year. Since it is the only government owned amusement park in the United States, it cannot be argued that amusement parks are traditional public fora.

*Id.* at *5 (footnote omitted). The court also noted that

the amusement area is largely self-contained. It is surrounded by fences and gates, which, in most areas, create clear demarcations between the amusement area and the other areas within Playland Park, and it does not serve as a natural thoroughfare for persons walking from place to place either within Playland or between the surrounding parks, facilities, and nearby residential areas.

*Id.* "Pursuant to the same analysis," the court found

that the picnic shelters, which are reserved for private use for parties and corporate events, the ice rink, Boardwalk Museum, pool, and miniature golf course are nonpublic fora.... Consequently, the County's restrictions on First Amendment expression are reasonable as applied to those areas.

*Id.* at *6.

The court concluded that the boardwalk, pier, paths, park, and unreserved picnic areas (as contrasted with the reserved picnic shelters) are, in fact, public fora:

Since sidewalks, streets and parks are "quintessential" public fora, the government bears the burden of establishing why some or all of these paths, park areas and the boardwalk should be considered different, and should not be open for First Amendment expression by the public.

*Id.* at *7. The court noted that "the County ha[d] not distinguished between the amusement area, ice rink, miniature golf course, picnic shelters, boardwalk museum, beach, and pool on the one hand, and the park, pier, boardwalk and paths on the other." *Id.* It found that the County's restrictions on First Amendment activity in the public fora (the park, pier, boardwalk, paths, and unreserved picnic areas) did not survive strict scrutiny:

[T]he County has not articulated a compelling state interest that makes such a restriction necessary. As the Second Circuit stated in *Loper,*

[i]t does not seem to us that any compelling state interest is served by excluding those who beg in a peaceful manner from communicating with their fellow citizens. Even if the state were considered to have a compelling interest in preventing the evils sometimes associated with begging, a statute that totally prohibits begging in all public places cannot be considered "narrowly tailored" to achieve that end.

*Id.* at *7–*8 (quoting *Loper v. New York City Police Department,* 999 F.2d 699, 705 (2d Cir.1993)). The court concluded that

Westchester County Law § 712.5[1] banning solicitation in any County park and regulation § 765.41, banning any and all solicitation anywhere in Playland Park, and the April 2002 permit application procedure, which states that "solicitation of any member of the Public is strictly forbidden at Playland," cannot withstand scrutiny and are unconstitutional as applied to the public forum areas within Playland.

*Hobbs I,* 2002 WL 31873462, at *8.

The court also held that the County's permitting scheme violated the First Amendment because "[i]t le[ft] the decision whether to grant or deny a permit to exercise First Amendment rights at any location within Playland Park in the discretion of the commissioner, who must determine, without clear standards, whether the activity at issue would 'substantially interfere with park use and enjoyment by the public.'" *Id.* at *9 (quoting Westchester County Regulation § 765.261(1) (2001)). The court further noted that

the regulation ... is not narrowly drawn to protect against a particular danger posed by a specific class of persons convicted of specific crimes. *It is not limited, for example, to the regulation of specific conduct by convicted pedophiles,* but rather gives the commissioner broad discretion to determine what classes of previously convicted persons should be generally prohibited from engaging in constitutionally protected speech. Moreover, the evaluation required by the standards set forth in these sections clearly involves an appraisal of subjective, content-based factors.

*Hobbs I,* 2002 WL 31873462, at *11 (emphasis added).

Having determined that the provisions of state and County law invoked by defendants could not bar solicitation in Playland's public areas, the court concluded that additional hearings were needed to resolve the "issues of fact remain[ing] as to the nature of specific areas within Playland Park." *Id.* at *12.

F. *Westchester County Executive Order No. 3–2003*

Prior to the resolution of the remaining issues, the County, reacting to the *Hobbs I* ruling that the existing laws were not sufficiently narrowly drawn, adopted a new permit policy. Acting through its County Executive in March 2003, the County issued the regulation that is at issue on this appeal, Westchester County Executive Order No. 3–2003 (the "Executive Order"), setting forth its permit policy. The Executive Order states in pertinent part as follows:

### EXECUTIVE ORDER NO. 3–2003

WHEREAS, the County owns various facilities that are held in trust for the public and are considered to be public property for the enjoyment of adults and children alike; and

WHEREAS, the public nature of certain County facilities mandates that the County allow individuals to exercise their First Amendment rights on said public property; and

WHEREAS, the need for these restrictions is especially necessary when such First Amendment conduct that is performed on public property may attract crowds and children; and

WHEREAS, the exercise of a single individual's right under the First Amendment should not infringe upon another individual's enjoyment relating to the use of County property . . . .

. . . .

### WESTCHESTER COUNTY PERMIT POLICY

I. *Purpose.*

This policy has been established to ensure reasonable restrictions on permits to solicit, perform, demonstrate or engage in other similar conduct *utilizing props and/or equipment* on Westchester County property that constitutes a public forum by limiting the time, place and manner of such activity in order to assure a safe and secure environment for the protection of the public at large.

II. *Application.*

*This policy shall apply to all individuals seeking to obtain a permit to solicit, perform, demonstrate, or engage in similar conduct utilizing props and/or equipment on public property owned by the County that is considered to be a public forum.* These restrictions are being imposed for the safety of the public at large and to ensure their enjoyment of the County facilities. *These restrictions are to be uniformly applied to all individuals regardless of the form*

*of First Amendment expression and these restrictions shall not be utilized for the sole purpose of suppressing any individual's activity.*

III. *Designated Permit Zones.*

On County public property that is deemed to be a public forum, there shall be a predetermined, designated zone where solicitation, performance, demonstration or other similar conduct utilizing props and/or equipment may be conducted. This permit zone shall be located in an area which shall minimize congestion or the obstruction of pathways, but shall also be situated in an area that is visible and accessible to the general public....

....

VI. *Prohibition.*

[¶ 1] In accordance with guidelines set forth in Article 23-a of the New York State Correction Law, any individual seeking a permit that [*sic*] has been convicted of a crime may be denied a permit if it is determined that: (1) there is a direct relationship between the criminal offense and the specific permit being sought; or (2) if the issuance of the permit would involve an unreasonable risk to property or safety or welfare of the general public.

[¶ 2] Notwithstanding the aforementioned, *no individual known to have been convicted of a sexual offense against a minor shall be permitted to obtain a permit if the solicitation, performance, demonstration or other similar activity would entice a child to congregate around that person* since the granting of such a permit would involve an unreasonable risk to the safety and welfare of children.

....

VIII. *Coordination of Efforts.*

The Department of Public Safety, the Department of Parks, Recreation and Conservation and any other appropriate County Department shall work together in order to properly administer and effectuate the provisions of this Executive Order, including but not limited to, coordinating with state and local law enforcement agencies to review the databases, as allowable under the law, that will assist in identifying known sexual offenders.

Westchester County Executive Order No. 3–2003, Whereas clauses 1–4, §§ I–III, VI, VIII (emphases added).

Hobbs attacked all of the provisions of the Executive Order. He challenged § VI as unconstitutionally vague, unconstitutional as applied to him, and violative of both the First Amendment and the *Ex Post Facto* Clause of the Constitution. He also argued that the second paragraph of § VI ("¶ 2" or the "Prohibition") lacks adequate procedural protections to prevent an erroneous deprivation of rights.

The district court heard argument on Hobbs's challenges to the constitutionality of Executive Order 3–2003. It also conducted evidentiary hearings as to, *inter alia,* the extent of the public forum areas within Playland and the damages suffered by Hobbs as a result of defendants' initial denials of a permit to Hobbs based solely on County laws that *Hobbs I* ruled unconstitutional.

G. *The Final Decision of the District Court:* Hobbs II

In an Opinion and Order dated August 13, 2003, the district court struck down § III of the Executive Order, which limited the public areas available for expressive activity by creating "Designated Permit Zones," *see Hobbs v. County of Westchester,* 2003 WL 21919882, at *8–*9 (S.D.N.Y. Aug.13, 2003) (*"Hobbs II"*). The court upheld § VI, ¶ 2, however, stating that

"[a]lthough Executive Order No. 3–2003 cannot stand consistently with the constitutional requirements stated" in *Hobbs I,* "the second paragraph of § VI can nevertheless be severed and enforced," *see id.* at *9.

First, the court held that ¶ 2 does not violate the *Ex Post Facto* Clause:

> Such a provision does not impose retroactive punishment in violation of the *Ex Post Facto* clause, provided that it is civil and non-punitive....
>
> In making that determination, the first place to look is to the County's stated intent, [*Smith v. Doe,* 538 U.S. 84, 92–93, 123 S.Ct. 1140, 1147, 155 L.Ed.2d 164 (2003) ], which clearly is to prevent "an unreasonable risk to the safety and welfare of children." Executive Order No. 3–2003, § VI, ¶ 2. Like in *Smith* and in *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), "nothing on the face of the statute suggests that the legislation sought to create anything other than a civil ... scheme designed to protect the public from harm." *Smith,* [538] U.S. at [93], 123 S.Ct. at 1147. Nor has Plaintiff suggested that the ordinance has any purpose other than to keep Mr. Hobbs, and anyone else who has been convicted of sexual abuse of children, from performing an act in which they seek to interact with children in a County owned park.
>
> In addition, in evaluating the constitutionality of the Prohibition, the Court must look to its effects in terms of whether, in its necessary operation, the restriction "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith v.*

> *Doe,* [538] U.S. at [97], 123 S.Ct. at 1149. The Court concludes that with respect to all of these criteria, the provision clearly is civil and regulatory, rather than criminal.

*Hobbs II,* 2003 WL 21919882, at *5 (footnote omitted).

In contrast, the court concluded that ¶ 2 implicates First Amendment rights and is a content-based restriction on speech:

> The second paragraph of § VI states that no permit will be granted to a person who has been convicted of a sexual offense against a minor if the "performance ... would entice a child to congregate around that person." "This blanket suppression of an entire type of speech is a content-discriminating act." *Free Speech Coalition v. Reno,* 198 F.3d 1083, 1091 (9th Cir.1999), *aff'd,* 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

*Hobbs II,* 2003 WL 21919882, at *6 n. 6. However, the court held that the Prohibition is not unconstitutional because it is narrowly tailored to meet a compelling state interest:

> There can be no question that protecting children from sexual predators constitutes a compelling state interest. *Smith v. Doe,* [538] U.S. at [103–04], 123 S.Ct. at 1153. *See also New York v. Ferber,* 458 U.S. 747, 757, 102 S.Ct. 3348, 3355, 73 L.Ed.2d 1113 (1982) ("The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance."). Moreover, the fact that the Prohibition creates a lifetime ban is reasonable in light of the recognition in the cases that "[t]he risk of recidivism posed by sex offenders is 'frightening and high,[' ''] and that " 'contrary to conventional wisdom, most reoffenses do not occur within the first several years after release,' but may occur 'as late as 20 years following release.[' ''] *Smith v.*

*Doe,* [538] U.S. at [103–04], 123 S.Ct. at 1153. Furthermore, as the Supreme Court stated in *Kansas v. Hendricks,* 521 U.S. 346, 360 & n. 3, 117 S.Ct. 2072, 2081 n. 3, 138 L.Ed.2d 501 (1997), "when a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation.[' "]

The second paragraph of § VI also is narrowly tailored to "target and eliminate no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988); *Dae Woo Kim v. City of New York,* 774 F.Supp. 164, 170 [ (S.D.N.Y.1991) ]. The Prohibition meets this standard because it applies, by its terms, only to individuals who have been convicted of a sexual offense against a minor, and specifically prohibits only "solicitation, performance, demonstration or other similar activity [that] *would entice a child to congregate around* that person." (emphasis added). Thus, consistently with this Order, even a convicted pedophile is free to go to Playland Park, or any other Westchester County park, to distribute leaflets or speak publicly regarding matters of personal or public concern, provided his activities and speech are oriented toward adults and are not of a nature that would be likely to "entice a child to congregate around" him.

Finally, as required by *Turner v. FCC,* 512 U.S. 622, 664, 114 S.Ct. 2445, 2470, 129 L.Ed.2d 497 (1994), the Executive Order can, in fact, be expected to alleviate the harm at which it is aimed "in a direct and material way." The County's "zero tolerance" policy surely will prevent performances of the type it seeks to prohibit.

*Hobbs II,* 2003 WL 21919882, at *6–*7 (emphasis in original).

The court concluded that any requirement of procedural due process would be satisfied by New York's ordinary civil remedies:

As stated in the December 23, 2002 Order [*Hobbs I* ], such a provision also must offer procedural safeguards to Plaintiff and others who are denied the opportunity to perform at Playland pursuant to a county regulation enacted to protect children from pedophiles. Although the Executive Order contains no appeal procedure, Defendants' counsel represented to the Court at oral argument that review of an allegedly arbitrary and capricious decision regarding enforcement of this Prohibition, made without a reasonable basis in fact, would be subject to review pursuant to the provisions of New York CPLR Article 78. The availability of such a mechanism for appeal is adequate to satisfy this requirement.

*Id.* at *6.

Finally, the court concluded that ¶ 2 is not impermissibly vague:

[A]s the Supreme Court stated in *Grayned[ v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) ], "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110, 92 S.Ct. at 2300. Moreover, it is a general rule of statutory construction that, absent a definition in the statute, courts construe words in their plain and ordinary sense. *Weinberg v. City of Chicago,* 310 F.3d 1029, 1042 (7th Cir. 2002). Applying this rule, the Court finds that the challenged language makes sufficiently clear that it prohibits all child-oriented performances, and thus satisfies the rule stated in *Roth v. United States,* 354 U.S. 476, 491, 77 S.Ct.

1304, 1312, 1 L.Ed.2d 1498 (1957), that "all that is required is that the language convey[ ] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Any possible over breadth or over definition by County officials of the "entice a child" provision can be cured through case-by-case analysis and review. *See New York v. Ferber*, 458 U.S. 747,[ ]773–74, 102 S.Ct. 3348, 3363–64, 73 L.Ed.2d 1113 (1982).

*Hobbs II*, 2003 WL 21919882, at *7 (footnote omitted).

However, the court found that prior to the issuance of Executive Order 3–2003, and nearly two years before they learned of Hobbs's criminal history, defendants had denied Hobbs's application for a permit to perform his act at Playland "without any investigation and without offering any alternative venue, solely on the basis of Westchester County regulations that have been held unconstitutional.... Therefore, Mr. Montalto's denial of Mr. Hobbs' request cannot be justified by those convictions." *Id.* at *3. The court concluded that Hobbs was "entitled to damages for Defendants' violation of his constitutional rights," *id.*, based on an estimate of moneys he would have received if he had actually busked at Playland, *see id.* at *4.

Judgment was entered awarding Hobbs $2,500 in compensatory damages, but ruling that Montalto, in his individual capacity, was entitled to qualified immunity. The court explicitly denied Hobbs's request for punitive damages and implicitly denied his requests for other relief; and the case was closed.

## H. *The Scope of the Present Appeal*

On this appeal, Hobbs challenges so much of the judgment as upheld the constitutionality of § VI, ¶ 2, of Executive Order 3–2003. Although his notice of appeal

also stated that he was appealing from the ruling that upheld the County's "ban on public speech within specified *non-public* areas within Playland" (Hobbs Notice of Appeal dated September 11, 2003 (emphasis added)), his brief on appeal contains no argument as to why that ruling was incorrect. Accordingly, we regard that challenge as abandoned. *See generally Otero v. Bridgeport Housing Authority*, 297 F.3d 142, 144 (2d Cir.2002); *Day v. Morgenthau*, 909 F.2d 75, 76 (2d Cir.1990); Fed. R.App. P. 28(a)(9).

Defendants have not cross-appealed to challenge any of the district court's rulings that were adverse to them.

## II. THE FIRST AMENDMENT CONTENTIONS

While conceding that ensuring the well-being of children is a compelling governmental interest, Hobbs contends principally that § VI, ¶ 2, of Executive Order 3–2003 is a content-based prior restraint that violates the First Amendment on the grounds (a) that it is not "the least restrictive means necessary to achieve its goal" (Hobbs reply brief on appeal at 7) because it "applies to every person who has been convicted of a sexual offense involving a minor, without any individual analysis of the speaker" (*id.* at 6), (b) that it "lacks efficacy" (Hobbs brief on appeal at 31) because it does not bar his presence at Playland or any other County park, and (c) that it is, on its face, overly broad both as to the speech it prohibits and as to the persons restrained. Defendants, while arguing that the district court did not err in ruling that ¶ 2 met the strict-scrutiny test that is applicable to content-based restrictions, also contend that only an intermediate level of scrutiny was required because the Prohibition is content-neutral. We conclude that ¶ 2 is content-neutral and survives intermediate scrutiny.

A. *The Focus of Executive Order 3–2003*

■ The pertinent Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, *see Thornhill v. Alabama,* 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), provides that "Congress shall make no law … abridging the freedom of speech …." U.S. Const. amend. I. "[S]peech" may include expressive conduct, *see, e.g., Texas v. Johnson,* 491 U.S. 397, 404–06, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), and certain principles governing the application of this First Amendment prohibition are well established.

The government's authority to regulate speech or expressive conduct on property that has traditionally been open to the public for such activity, such as public streets and parks, is sharply circumscribed. *See, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (plurality opinion); *Perry Education Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). A "prior restraint[ ]" on speech, *i.e.,* any regulation that "g[i]ve[s] public officials the power to deny use of a forum in advance of actual expression," *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 552–53, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), such as a requirement that a permit be obtained in advance of the proposed speech or conduct, *see, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. at 130, 112 S.Ct. 2395, is "not unconstitutional *per se,*" but it "bear[s] a heavy presumption against its constitutional validity," *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. at 558, 95 S.Ct. 1239 (internal quotation marks omitted).

Restraints on speech on the basis of its content, except in a few limited categories such as obscenity, defamation, and fighting words, are generally disallowed. *See, e.g., R.A.V. v. City of St. Paul,* 505 U.S. 377, 382–83, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,* 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Police Department of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Cantwell v. Connecticut,* 310 U.S. 296, 309–11, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). "[T]he fundamental principle that underlies our concern about 'content-based' speech regulations," *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), is that the government is not permitted to " 'grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views,' " *id.* at 48–49, 106 S.Ct. 925 (quoting *Police Department of Chicago v. Mosley,* 408 U.S. at 96, 92 S.Ct. 2286). The concern is that if the government were able "to impose content-based burdens on speech," it could "effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,* 502 U.S. at 116, 112 S.Ct. 501; *see, e.g., Leathers v. Medlock,* 499 U.S. 439, 448–49, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). Further, "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Carey v. Brown,* 447 U.S. 455, 462 n. 6, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). In

short, regulations of speech based on its content "are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. at 382, 112 S.Ct. 2538.

■ However, this presumption of invalidity can be overcome if the restriction passes a strict test. *See, e.g., Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (majority opinion) (content-based restrictions on political speech "must be subjected to the most exacting scrutiny"). Under the strict-scrutiny test, a content-based restriction may be upheld if the restriction serves a "compelling" governmental interest, "is *necessary* to serve the asserted [compelling] interest," *R.A.V. v. City of St. Paul*, 505 U.S. at 395, 112 S.Ct. 2538 (emphasis and brackets in *R.A.V.*) (internal quotation marks omitted), is precisely tailored to serve that interest, and is the least restrictive means readily available for that purpose, *see, e.g., Ashcroft v. American Civil Liberties Union*, — U.S. —, —, 124 S.Ct. 2783, 2791, 159 L.Ed.2d 690 (2004); *Boos v. Barry*, 485 U.S. at 321, 329, 108 S.Ct. 1157 (majority opinion).

■ In contrast, a less stringent test— applying "intermediate scrutiny"—is applicable to regulations of expressive activity that are not based on content. *See, e.g., City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion); *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n. 6, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Content-neutral regulations may limit the time, place, or manner of expression—whether oral, written, or symbolized by conduct—even in a public forum, so long as the restrictions are "reasonable," are "narrowly tailored to serve a significant governmental interest," and "leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non–Violence*,

468 U.S. at 293, 104 S.Ct. 3065; *see, e.g., Ward v. Rock Against Racism*, 491 U.S. at 791, 109 S.Ct. 2746; *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. at 47, 106 S.Ct. 925. Although a restriction that is content-neutral must be "narrowly tailored" to serve the governmental interest, "it need not be the least restrictive or least intrusive means of doing so." *Ward v. Rock Against Racism*, 491 U.S. at 798, 109 S.Ct. 2746; *see, e.g., id.* n. 6 ("While time, place, or manner regulations must ... be 'narrowly tailored' in order to survive First Amendment challenge, we have never applied strict scrutiny in this context. As a result, the same degree of tailoring is not required of these regulations, and least-restrictive-alternative analysis is wholly out of place."). The "narrow tailoring" requirement "is satisfied so long as the ... regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.* at 799, 109 S.Ct. 2746 (internal quotation marks omitted).

■ In the analysis of whether a regulation is content-based or content-neutral, the "principal inquiry ..., in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* at 791, 109 S.Ct. 2746; *see, e.g., Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. at 116; *Leathers v. Medlock*, 499 U.S. at 448, 111 S.Ct. 1438; *FCC v. League of Women Voters of California*, 468 U.S. 364, 383–84, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward v. Rock Against Racism*, 491 U.S. at 791, 109 S.Ct. 2746 (emphasis omitted) (quoting *Clark v. Community for*

*Creative Non–Violence,* 468 U.S. at 293, 104 S.Ct. 3065); *see, e.g., City of Renton v. Playtime Theatres, Inc.,* 475 U.S. at 48, 106 S.Ct. 925.

"A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. 2746; *see, e.g., City of Renton v. Playtime Theatres, Inc.,* 475 U.S. at 47–48, 106 S.Ct. 925. Thus, a regulation that targets only potentially harmful secondary effects of speech, rather than the contents of the speech itself or the listener's agreement or disagreement with those contents, is deemed content-neutral. *See, e.g., City of Erie v. Pap's A.M., TDBA "Kandyland",* 529 U.S. 277, 291, 296, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion); *id.* at 291, 120 S.Ct. 1382 (plurality opinion)(ordinance prohibiting public nudity and thus nude dancing was "not [an] attempt to regulate the primary effects of the expression, *i.e.,* the effect on the audience of watching nude erotic dancing, but rather [targeted] the *secondary effects, such as the impacts on public health, safety, and welfare."* is content-neutral (emphasis added)); *id.* at 296, 120 S.Ct. 1382 (plurality opinion) ("Erie's asserted interest in combating the negative secondary effects associated with adult entertainment establishments like Kandyland is unrelated to the suppression of the erotic message conveyed by nude dancing."). A restriction designed to serve a governmental "need to protect the security" of the audience targets the speech's secondary, rather than its primary, effect. *Boos v. Barry,* 485 U.S. at 321, 108 S.Ct. 1157 (plurality opinion).

Finally, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must also provide "narrow, objective, and definite standards to guide the licensing authority" in acting on the permit application. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *see, e.g., Forsyth County v. Nationalist Movement,* 505 U.S. at 130–31, 112 S.Ct. 2395; *Niemotko v. Maryland,* 340 U.S. 268, 271–72, 71 S.Ct. 328, 95 L.Ed. 280 (1951).

Application of these principles in the present case leads us to the conclusion that Westchester County Executive Order No. 3–2003 survives constitutional scrutiny because the County has the requisite interest in the welfare of children, the permit requirement is content-neutral, and this content-neutral requirement serves the governmental interest and is narrowly tailored to serve that interest. And, as discussed in Part II.C. below, the Executive Order provides County officials with sufficient guidance to prevent arbitrary denials of permit applications.

First, it is indisputable and undisputed that a significant and substantial governmental interest is at stake. The government has "a *compelling* interest in protecting the physical and psychological well-being of minors," *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (emphasis added), indeed, an interest "of surpassing importance," in preventing the sexual exploitation of children, *New York v. Ferber,* 458 U.S. 747, 757, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). (*See* Hobbs brief on appeal at 15 ("there is no dispute that ensuring the well-being of children is a compelling governmental interest"; *id.* at 25 (same).))

Second, the Executive Order, whose pertinent provisions are set out in Part I.F. above, is content-neutral. Although it deals with speech or expressive conduct to the extent that the activity constitutes

"solicit[ation]," perform[ance]," "demonstrat[ion]" or "other similar conduct," *e.g.,* Westchester County Executive Order No. 3–2003, §§ I, II, VI-activity that we will refer to collectively as "presentations"—the Executive Order does not impose the permit requirement on any person or group of persons on the basis of any particular viewpoint or any particular topic. Without discriminating on the basis of content, the Executive Order focuses first—and potentially only—on the means by which the speaker's message is to be delivered. The *"Application"* section states that "[t]his policy shall apply to all individuals seeking to obtain a permit to solicit, perform, demonstrate, or engage in similar conduct *utilizing props and/or equipment* on public property owned by the County that is considered to be a public forum." *Id.* § II (emphasis added); *see also id.* § I (similarly referring to the use of "props and/or equipment" in connection with the description of. the *"Purpose"* of the permit requirement). There is no indication in the Executive Order that a permit is required of any person who does not use "props and/or equipment." Accordingly, in the district court, the County repeatedly noted the "props and/or equipment" limitation on the applicability of its permit requirement. For example, in an April 2003 memorandum, the County stated that "[t]he language of the [Executive] Order is limited and specific; it applies ... *only* to a 'solicitation, performance or demonstration ... utilizing props and/or equipment' (and not, for example to hand billing or hand billing and advocating verbally) ....* " (Defendants' Post–Hearing Memorandum of Law dated April 17, 2003, at 8 (emphases added).) In a June 2003 memorandum, the County stated that "Executive Order 3–2003 applies· only to individuals who seek to engage in a very limited class of expressive activities (to wit, persons who seek to 'solicit, perform, dem-

onstrate, or engage in similar conduct ...') *and even then, only when those activities involve the use of 'props and/or equipment'.*" (Defendants' Memorandum of Law Regarding Issues Raised at the June 2, 2003 Hearing, dated June 16, 2003, at 2 (emphasis added).) And at a later hearing on Hobbs's challenges to the Executive Order, when the court asked for confirmation that, if the speaker "just dressed as a clown and did a funny act[,] ... made funny faces, [and] mimed," attracting people to congregate, but used no props, "that is not prohibited," the County responded, "That is correct." (Hearing Transcript, June 20, 2003, at 18.)

Although the phrase "props and/or equipment" does not appear in § VI·of the Executive Order, and the district court analyzed the Prohibition as if it were applicable irrespective of whether a speaker sought to use props or other equipment, *see Hobbs II,* ·2003 WL 21919882, at *9 n. 8, we think it more appropriate to view the Executive Order as setting forth an integrated permit scheme. Both § II, *i.e.,* the *"Application"* section that describes the broad class of individuals to whom "[t]his policy shall apply," and § VI, *i.e.,* the *"Prohibition"* section that describes how the policy is to be applied to one category of applicants, appear in the Part headed "WESTCHESTER COUNTY PERMIT POLICY," and we regard § II as an integral part of the Prohibition stated in § VI. The Executive Order does not by its terms extend to a person who wishes to convey his or her message, whatever that message may be, without the use of physical articles or equipment as theatrical aids. As we read the Executive Order, therefore, and as it·is expressly interpreted by the County itself, a person not seeking to use props and/or equipment need not apply for a permit.

Hobbs, according to his complaint, seeks to deliver to the public various "messages [that] often have political value, and or social value." (Complaint at 6.) His political messages "comment[ ] on government inefficiency. *He is criticizing the Government.* He is criticizing the daffiness of some civil servant controlled governmental processes. His message is political and critical of the government." (*Id.* at 12 (emphasis in original).) He apparently illustrates his point by, *inter alia,* referring to government inefficiency in responding to requests by General George Washington during the Revolutionary War. (*See id.* at 13–14.) Hobbs also seeks to remind the public of the plight of the homeless, including homeless veterans of the military. (*See id.*) And he "promotes good will and honesty and obedience to parents," "promotes diversity and universal acceptance of others," and "discourages prejudice and pride." (*Id.* at 23.)

Nothing in the Executive Order prevents Hobbs from communicating his criticisms of the government and his other social commentary—or from providing entertainment—in words or expressive action. As just discussed, the Executive Order affects only the manner of presentation through the use of props and/or equipment. Although Hobbs alleges that "[t]he balloon is a tool through which he conveys his message" (Complaint at 13), plainly such a prop is not integral to political or social-conscience messages, and nothing prevents Hobbs from delivering his messages or entertaining without that prop.

Further, the goal of the Executive Order's Prohibition plainly is to protect the safety and welfare of children using public property. At the outset, the Executive Order notes the use of such areas by children, *see, e.g.,* Westchester County Executive Order No. 3–2003, WHEREAS clauses 1 & 3; the "*Application*" section states generally that the "restrictions are being imposed for the safety of the public," *id.* § II; and the "*Prohibition*" section states expressly that its ban on the issuance of permits to persons known to have been convicted of sex offenses against minors, where the presentation would entice children to congregate around such known sex offenders, is meant to prevent "unreasonable risk[s] to the safety and welfare of children," *id.* § VI.

In providing that no permit will be granted where the applicant is "*known to have been convicted of a sexual offense against a minor . . . if the [presentation] would entice a child to congregate around that person,*" *id.* (emphases added), the Prohibition is not concerned with the content of the message, or the audience's agreement or disagreement with the message, or the audience's enjoyment of the presentation. By focusing on prop-assisted presentations that would entice a child to congregate around a person known to have been convicted of a sexual offense against a minor, the Prohibition looks beyond primary effects such as mere enjoyment of the presentation. Rather, it focuses on the safety of children and aims to limit the opportunity for such a convicted sexual offender to attract children with whom he might later engage in child molestation. The Prohibition thus targets effects that are secondary.

To be sure, the content of the applicant's proposed presentation can be examined—along with the proposed props and/or other equipment—to determine whether the presentation is likely to attract a crowd of children. But the specific content of the speech—whether the speaker is talking about animals, fairy tales, government inefficiency, or the plight of homeless veterans—is irrelevant to the governmental goal that a person with a criminal record

of sexual offenses against minors not be permitted to use artifices to entice children to gather around him, developing rapport with the children and gaining new opportunities for child molestation. We conclude that the Executive Order constitutes a restriction only on the manner of speech and is designed to prevent harmful secondary effects unrelated to its content.

We are unpersuaded by Hobbs's contentions that the Prohibition is neither necessary nor narrowly tailored for the achievement of its purpose. As to necessity, it cannot reasonably be disputed that there exists a need for concern for the welfare of children in the presence of persons who have committed sexual offenses against minors. The Supreme Court in *Smith v. Doe,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), for example, which was decided a few days before the issuance of Executive Order 3–2003, discussed "the high rate of recidivism among convicted sex offenders and their dangerousness as a class," 538 U.S. at 103, 123 S.Ct. 1140, and quoted a 1997 United States Department of Justice report which noted that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault," *id.* (internal quotation marks omitted). Further, before issuing the Executive Order, the County had sought the advice of Dr. Pogge, whose report discussed the "relatively high recidivism rate" of sexual offenders in general and the even higher rate for persons whose offenses were either homosexual or pedophilic (Pogge Report at 4). It is permissible for a municipality to conclude that secondary-effects-oriented regulations are necessary based on evidence such as this, which "is reasonably believed to be relevant to the secondary effects that they seek to address." *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. at 442, 122 S.Ct. 1728 (plurality opinion) (internal quo-

tation marks omitted); *see, e.g., City of Erie v. Pap's A.M., TDBA "Kandyland",* 529 U.S. at 296, 120 S.Ct. 1382 (plurality opinion) ("in terms of demonstrating that such secondary effects pose a threat, the city need not 'conduct new studies' ... 'so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses' ") (quoting *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. at 51–52, 106 S.Ct. 925).

Finally, the Prohibition is narrowly tailored to further its purpose. It applies only to certain persons known to have been convicted of a sexual offense against a minor, and the Executive Order expressly requires County officials to work closely with law enforcement agencies in order to determine whether a given applicant is such a person, *see* Westchester County Executive Order No. 3–2003, § VIII. Given the high rate of recidivism by convicted child molesters and the facts, *inter alia,* that (a) the permit requirement does not apply to persons whose presentations would not use props and/or equipment, and (b) the Prohibition (i) does not apply to a person who is merely suspected or who has been accused but not convicted of being a sexual offender against a minor, and (ii) does not apply, even as to a person known to have been convicted of a sex offense against a minor, if the planned presentation, even with props and/or equipment, would not entice a child to congregate around that person, we conclude that the Prohibition is a manner-of-presentation restriction that is narrowly tailored to further the County's compelling interest in the safety and welfare of children.

B. *Application of the Prohibition to Hobbs*

██ We see no constitutional impediment to the application of the Executive

Order's Prohibition to Hobbs. Notwithstanding his complaint's description of the contents of his messages as political and social-issue oriented, his performances are expressly directed toward children. Several photographs introduced at a hearing in the district court show Hobbs on the Playland boardwalk, seated in a chair with various equipment at his side and a sign reading, in part, "A theater experience for 3 and 4 year olds." (*See* Hearing Transcript, April 3, 2003, at 21, 37; Defendants' Exhibit 3.) In one of the pictures, Hobbs is performing and displaying balloon sculptures. In his complaint, Hobbs alleges, *inter alia,* that "[t]he balloon is a tool through which he conveys his message" and "helps attract his audience" (Complaint at 13); that, although adults are repelled, his performance is particularly attractive to children, who try to help him understand how to inflate a balloon (*see id.* at 12–15); that his performance is "interactive" (*id.* at 8); that the balloon "creates a tie between [himself and] those watching him" (*id.* at 13); and that he hands balloons to children (*see id.*). Further, the complaint indicates that the desire of the children to congregate around Hobbs is long-lasting, as, after seeing Hobbs's act once, they repeatedly ask when they can go to see Hobbs again. (*See id.* at 14–15.) It is undisputed that Hobbs had twice been convicted of child molestation offenses, and his own descriptions of his act compel the conclusion that his act, using props, would entice children to congregate around him.

▮ Finally, we reject Hobbs's contention that the Prohibition should be invalidated on the ground that it "lacks efficacy" (Hobbs brief on appeal at 31) because it does not bar his presence at Playland or any other County park. His presence indeed is not barred, nor is the mere expression of his views. *See, e.g., Hobbs II,* 2003 WL 21919882, at *6 ("[E]ven a convicted pedophile is free to go to Playland Park, or any other Westchester County park, to distribute leaflets or speak publicly regarding matters of personal or public concern, provided his activities and speech are oriented toward adults and are not of a nature that would be likely to 'entice a child to congregate around' him."). But Hobbs and other persons convicted of sexual offenses against minors need not be banned from public property entirely in order for the Prohibition to achieve at least some of the desired effect. The efficacy of the Prohibition lies in its limitation on Hobbs's ability to entice children to come near him through the use of equipment such as the balloons he seeks to hand them—accoutrements seemingly necessary to enhance the attraction, given that the contents of the messages Hobbs alleges he delivers (*e.g.,* tolerance, the plight of the homeless, government inefficiency) seem unlikely to hold the attention of a child. The governmental goal of limiting opportunities for child molestation by one previously convicted of a sexual offense against a minor would be achieved less effectively absent the Prohibition. Hobbs's "efficacy" challenge is thus meritless and instead simply confirms that there are other means by which Hobbs can deliver his messages.

We conclude that the Executive Order is content-neutral, aimed only at promoting the safety and well-being of children; it imposes a reasonable limitation on the manner of expression, without reference to content; and it is narrowly tailored to, and does, address the concededly compelling governmental interest. As applied to Hobbs, it does not violate the First Amendment.

## C. *Hobbs's Facial Challenge to ¶ 2*

▮ Hobbs also contends that the Prohibition is "facially unconstitutional" be-

cause it is "substantially overbroad" in that it "prevents an entire class of people from engaging in public speech under any and all circumstances and throughout all public areas in Westchester County." (Hobbs brief on appeal at 34–35.) He argues that the Prohibition is invalid because (a) it automatically disqualifies all persons convicted of a sexual offense against a minor "without any individual assessment as to their risk of recidivism in general or specifically with respect to minors who would see and listen to their performances, demonstrations or similar activities" (*id.* at 35); (b) "almost any performance or demonstration in a public area, regardless of its substance or whom it is directed at, would likely 'entice a child to congregate around' . . . the speaker" (*id.* at 40); and (c) ¶ 2 thus "gives unbridled discretion to a County employee" to discriminate against a permit applicant on the basis of viewpoint (*id.* at 41). We disagree.

It is established that the courts may, as "an exception to ordinary standing requirements," *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988), entertain a claim that a law, even if constitutional as applied to the claimant, is so broad that it "may inhibit the constitutionally protected speech of third parties," *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). However, that exception is narrow. "Invalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.' " *FCC v. Pacifica Foundation*, 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (plurality opinion) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Invalidation of Exec-

utive Order 3–2003 on the ground of overbreadth is not warranted here.

As discussed in Part II.A. above, the Prohibition in § VI, ¶ 2, is narrowly tailored to the County's compelling interest in protecting children from sexual predation. Contrary to Hobbs's assertion, the Prohibition does not "prevent[ ] an entire class of people from engaging in public speech under any and all circumstances" (Hobbs brief on appeal at 34–35). The circumstances encompassed by the Prohibition are, as discussed above, narrowly circumscribed. Hobbs's contention that a fully rehabilitated person who had been convicted 20 years ago of a misdemeanor sexual offense would not be permitted "to give a public speech on the dangers of pedophilia" (*id.* at 38) simply ignores the scope of the Executive Order. We would agree that if Hobbs were to give such a speech in conjunction with his self-styled "theater experience for 3 and 4 year olds" (Defendants' Exhibit 3), accompanied by the balloon sculptures that his complaint alleges attract children to him, his presentation would be within the scope of ¶ 2. But if given without props and/or equipment, such a speech-or any speech on any topic from any viewpoint—is beyond the scope of the Executive Order, and no permit is required.

Nor does the Prohibition apply to "an entire class of people" (Hobbs brief on appeal at 34). Rather, it applies only to members of a group that generally has a high rate of recidivism and poses a threat to the safety and welfare of children, *i.e.*, persons known to have been convicted of a sexual offense against a minor, and it does not apply to all such persons. Within the class of persons known to have been convicted of a sexual offense against a minor, the Executive Order itself does not apply if the person will not use props or other such equipment in his presentation; and the

Prohibition in the Executive Order does not apply if the presentation is not likely to entice children to gather around him.

The framing of the Prohibition in terms of the category of persons whom the County has ascertained have been convicted of a sexual offense against a minor is not unreasonable. We reject Hobbs's suggestion that the County must instead undertake an "individual assessment" of the likelihood of recidivism by each such permit applicant (*id.* at 35). The imposition of that additional requirement, thereby necessitating substantial expenditures of time and resources for, *inter alia*, face-to-face psychiatric evaluation sessions by professionals, would not be reasonable. *Cf. United States v. American Library Ass'n*, 539 U.S. 194, 208, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion) (libraries may permissibly employ internet filtering software to "exclude certain categories of [potentially inappropriate] content, without making individualized judgments").

Finally, we are not persuaded that the Executive Order gives the County's licensing officials unbridled discretion to deny a permit application. First, the permit requirement does not apply unless props and/or equipment would be used. Second, if such aids would be used, the "*Prohibition*" section itself describes the factors that require denial of a permit. It does not authorize denial of the application unless the applicant is "known" to have been convicted of a sex offense against a minor. Thus, denial of a permit is not authorized on the basis of mere suspicions or unproven allegations of child molestation. Section VIII of the Executive Order requires County officials to coordinate with law enforcement agencies in order to learn whether an applicant has been so convicted. Further, the Prohibition requires the licensing official to determine whether the proposed presentation would "entice a

child" to congregate around the applicant, a phrase that squarely focuses the official's attention on whether the proposed presentation is child-oriented. We reject Hobbs's contention that "almost any" presentation "would likely 'entice a child to congregate around'" the presenter (Hobbs brief on appeal at 40), although we agree that whether children are so enticed may well be unrelated to the presentation's "substance" (*id.*). For example, the mere contents of the messages that Hobbs states he is conveying (*e.g.*, the plight of the homeless, government inefficiency) would hardly be likely to entice children to congregate. His presentation of those messages with props and/or equipment such as balloons, however, is plainly child-oriented; and, as his complaint asserts, children are attracted by the manner of his presentation. If an applicant sought to deliver a speech simply using, for example, placards of text, such a presentation would seem not to be one that would entice children to congregate. (*See, e.g.*, Defendants' Post–Hearing Memorandum of Law dated April 17, 2003, at 8 ("hand billing and[/or] advocating verbally" does not require a permit).)

We conclude that the Executive Order's statement in § II as to the scope of the County's permit policy, expressly limiting the policy's applicability to presentations using props and/or equipment, and the criteria set forth in § VI, ¶ 2, specifying that a permit is to be denied if (a) the applicant is a person known to have been convicted of a sexual offense against a minor and (b) the presentation would entice a child to congregate, provide sufficient guidance to County officials and do not allow them discretion to deny a permit on the basis of content or viewpoint. To the extent that a given applicant might in fact be denied a permit in connection with the planned use of props or equipment in a non-child-oriented type of presentation, that applicant

would be free, as the district court concluded in *Hobbs II*, 2003 WL 21919882, at *6, to seek judicial review in an Article 78 proceeding, *see* N.Y. C.P.L.R. § 7801 *et seq.* (McKinney 1994), challenging ¶ 2 on the ground that it was unconstitutionally applied to him or her.

In sum, we conclude that Executive Order 3–2003 is not facially overbroad.

## III. THE *EX POST FACTO* CHALLENGE

 Hobbs also contends that the Prohibition in Executive Order 3–2003 amounts to further criminal punishment of previously convicted sex offenders and hence violates the *Ex Post Facto* Clause of the Constitution. Again, we disagree.

The *Ex Post Facto* Clause provides that "[n]o State shall ... pass any ... ex post facto Law," U.S. Const. art. I, § 10, cl. 1. Under this Clause, the government may not, *inter alia*, enact a law that punishes an act that was innocent prior to the enactment or a law that inflicts a greater punishment than was applicable to the crime when committed. *See, e.g., Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The *ex post facto* bar, however, is applicable only to "criminal punishments," and does not "include retrospective laws of a different character." *Kentucky Union Co. v. Kentucky*, 219 U.S. 140, 153, 31 S.Ct. 171, 55 L.Ed. 137 (1911); *see also Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997).

"[W]here unpleasant consequences are brought to bear upon an individual for prior conduct," the fundamental question "is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation." *De Veau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960). The former would violate the *Ex Post Facto* Clause; the latter would not. *See, e.g., Lynce v. Mathis*, 519 U.S. at 445, 117 S.Ct. 891 (statute retroactively canceling former prisoner's earned provisional release credits, with which he had secured an early release, and requiring his return to prison, violated *Ex Post Facto* Clause by increasing punishment for crime); *De Veau v. Braisted*, 363 U.S. at 160, 80 S.Ct. 1146 (statutory ban against employment of convicted felons in jobs involving collection of union dues from various waterfront workers did not impose a criminal penalty); *Hawker v. New York*, 170 U.S. 189, 191–92, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (same for statutory ban against convicted felons' practice of medicine). In addressing the question of whether a penalty is "criminal," we analyze, *inter alia*, "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith v. Doe*, 538 U.S. at 96–97, 123 S.Ct. 1140.

The Prohibition provision in Executive Order 3–2003 does not impose a criminal penalty. Requirements by municipalities that permits be obtained for demonstrations, parades, and other types of gatherings in public fora have long been required; but those requirements have not been in the nature of punishment. Nor does the Executive Order impose a significant "affirmative disability or restraint" on convicted pedophiles. It "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith v. Doe*, 538 U.S. at 100, 123 S.Ct. 1140. And although the Executive Order's requirement that such a person apply for a permit in order to give

a presentation using props and/or equipment might be considered an affirmative restraint, *see Smith v. Doe*, 538 U.S. at 101, 123 S.Ct. 1140, it plainly is not a restraint that is designed to be punitive, for the permit requirement for prop-assisted presentations applies to all applicants, whether or not they have been convicted of any crime. Moreover, the restraint is *de minimis* given that anyone, even a convicted pedophile, who wishes to engage in expressive activity without the use of props and/or equipment needs no permit.

Nor is the Prohibition's permit requirement intended to serve the traditional purposes of punishment, which include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might contemplate committing similar crimes, *see generally* 1 W. LaFave, *Substantive Criminal Law* § 1.5(a)(2d ed.2003). Although potentially related to deterrence and prevention, the stated purpose of the Executive Order is simply the protection of children. The relationship is not sufficient to make the Prohibition a criminal penalty, for "[t]o hold that the mere presence of a deterrent purpose renders such sanctions 'criminal' ... would severely undermine the Government's ability to engage in effective regulation," *Smith v. Doe*, 538 U.S. at 102, 123 S.Ct. 1140 (internal quotation marks omitted).

Finally, it is plain, as discussed in Part II.A. above, that the Prohibition against allowing convicted pedophiles to make prop-assisted presentations that would entice children to congregate around the pedophiles has a rational connection to the Executive Order's purpose. And given the limited application of the Executive Order, which does not impose the permitting requirement even on a person previously convicted of a sex crime against a minor if that person does not wish to use props and/or equipment in his presentation, we cannot conclude that the Executive Order is excessive with respect to its purpose.

In sum, we see no violation of the *Ex Post Facto* Clause.

## CONCLUSION

We have considered all of Hobbs's contentions on this appeal and have found them to be without merit. For the reasons stated above, the judgment of the district court is affirmed.

JON O. NEWMAN, Circuit Judge, concurring.

I concur in Judge Kearse's comprehensive opinion, but am not entirely persuaded that the Appellees have effectively limited the application of their permit prohibition only to those convicted of a sexual offense against a minor *who use props* to entice children to congregate about them in the course of a performance. Even if the prohibition is not so limited, however, I see no valid First Amendment objection to its application to Appellant Hobbs, whether or not he uses props in the course of his performances.